HE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| HELDER FLORES, | § | |
| Plaintiff, | § | |
| v. | § | |
| HARRIS, THOMAS LOYD, | § | |
| ANTON M. MAWHOOD, CITY | § | CIVIL CASE NO.: 4-17-CV-3817 |
| OF HOUSTON, LA ESTANCIA | § | JURY DEMAND |
| APARTMENTS, 2012 MULTI- | § | |
| FAMILY REAL ESTATE | § | |
| FUND, | § | |
| LLC, | § | |
| Defendants | | |

**PLAINTIFF HELDER FLORES'S FOURTH AMENDED COMPLAINT**

TO THE HONORABLE JUDGE LEE H. ROSENTHAL:

Plaintiff, Helder Flores brings the following claims for premises liability, negligent supervision, negligent training, negligent supervision and retention against Defendants, La Estancia Apartments, and 2012 Multi-Family Real Estate Fund ("Complex Defendants"), and under the Fourth and Fourteenth Amendment of the United States Constitution claim, wrongful prosecution, illegal search and seizure, excessive force, equal protection and negligence, Monell claims against

Defendants, Mawhood, Harris, and City of Houston (collectively "City Defendants"). The action brought by the Plaintiff pursuant to 42 U.S. C. §1983, § 1985, § 1988, and Texas State Law.

## **PARTIES**

1. Plaintiff, Helder Flores, is an individual, residing in Harris County, Texas whose mailing address is P.O. Box 27353, Houston, TX 77227.

2. Defendant, City of Houston, is a Texas municipal corporation that operates the Houston Police Department (the "HPD" or "Department"), located in Harris County , Texas. The City of Houston is a "person" under 42 USC § 1983, and at all times relevant to this case acted under the color of law. The City of Houston funds and operates the Houston Police Department, which along with Mayor Sylvester Turner, the Houston City Manager, and the Houston City Council are responsible for the implementation of the police department's budget, policies, procedures, practices, and customs as well as the acts and omissions, challenged by this suit. The City of Houston may be served with citation at 900 Bagby St , Texas, 77002.

3. Defendant, Thomas Loyd Harris, an individual sued in both his individual capacity and as an agent and employee of the La Estancia Apartments, was

at all times relevant to this action a security officer employed by La Estancia Apartments. Harris is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual capacity, and may be served wherever he may be found.

4. Defendant, Anton M. Mawhood, an individual sued in both his individual capacity and as an agent and employee of the La Estancia Apartments, was at all times relevant to this action a security officer employed by La Estancia Apartments. Harris is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual capacity, and may be served wherever he may be found.

5. Defendant, La Estancia Apartments, owns the property located at the premises were the cause of action took place, and hired Defendants, Thomas Loyd Harris, and Anton Mawhood to perform security duties on or about July 22, 2015, and may be served wherever it registered agent may be found.

6. Defendant, 2012 Multi-Family Real Estate Fund, LLC sued under its assumed name La Estancia Apartments. owned the property located at the premises were the cause of action took place, and hired Defendants, Thomas Lloyd Harris, and Anton Mawhood to perform security duties on or about July 22, 2015, and may be served wherever it registered agent may be found.

## JURISDICTION

7.      This court has jurisdiction over this action based on the amount in controversy, more than ten thousand dollars, and the nature of the claim, and personal, and the cause of action occurred in Harris County Texas.

8.   This court has jurisdiction over Plaintiff's state law claims and supplemental jurisdiction over the federal claims, under the Civil Rights Act of 1871 pursuant to 28 U.S.C. §§1331, and 28 U.S. C. §1343. Jurisdiction under Haywood v. Brown, 556 U.S. 729,731 (2009); Patsy v. Board of Regents of Florida, 457 U.S. 496, 506-07 (1982).

## VENUE

9.   Venue of this suit lies in Harris County, Texas because all or a substantial part of events or omissions giving rise to the claim occurred in the county of suit; and because defendants conduct business in the county of suit. Tex. Civ. Prac. & Rem.Code § 15.002(a)(1).

## FACTS

10.    In 2011, a man was murdered in La Estancia Apartments and again in 2015.

11.    La Estancia had security officers employed at the complex at that time.

12.    In March 2015, La Estancia employed Guardian Equity Management/ Guardian catalyst to hire off duty officers.

13.     Guardian Equity Management/ Guardian catalyst contacted HPD coordinator Michael Prause, an HPD officer, seeking off duty HPD officers to provide security to its property located at 6200 Gulfton St, Houston, TX 77081.

14.     La Estancia was able to control the officers through its coordinator Michael Prause.

15.     Michael Prause would provide directions to officers that he coordinated with based on the orders he received from the off duty employers, including La Estancia, that hired him to control the officers.

16.     La Estancia hired two friends, Thomas L Harris and Anton Mawhood .

17. Thomas L Harris and Anton Mawhood vacation together, and have been in each other's weddings.

18. They were hired on the recommendation of another Guardian Equity Management/ Guardian catalyst  and Michael Prause. Michael  Prause  was another HPD officer  with  the  same  rank,  and  solely  because  Harris  and  Mawhood   were an active HPD officer.

19.     La Estancia hired Defendants, Harris and Mawhood for an indefinite period.

20.     It  did  not  conduct  any  background  checks  on  either  officer,  Harris,  or Mawhood,  for  their  criminal,  credit,  employment  history  or  current employment.

21.     There is nothing prohibiting it from conducting any background checks, or searches in an effort to prevent foreseeable harm to the general public.

22.     In fact, had La Estancia or its agents conducted a simple internet search it would have found that Thomas Loyd Harris had been indicted for the death of an unarmed black man, Sylvanus Okhueleigbe.

23.     It could have inquired with Harris about the killing of Sylvanus Okhueleigbe.

24.     La Estancia did not inquire but could have inquired with Harris or Prause directly about any prior conduct of Harris resulting in harm.

25.     Sylvanus Okhueleigbe died after Harris employed a chokehold on him until he "quit moving."

26.     The cause of death was asphyxiation with neck compression and fracture of thyroid cartilage, a fact that Harris will not admit to this day.

27.     Harris continues to allege Okhueleigbe simply stop moving and had a cardiac event, as he laid on top of Okhueleigbe with his arms around his neck, until he stopped breathing.

28.     He also claimed Sylvanus Okhueleigbe had a weapon and he was forced to defend himself, like with Helder Flores.

29.     The weapon Harris believed Sylvanus Okhueleigbe did not exist the only

thing on Mr. Okhueleigbe was a business card holder.

30.    Before the IAD investigation was completed, by the Fort Bend District attorney's office. Houston Police Officers Union stated "We're standing by our officer. We don't feel that his actions were inappropriate that night. He was defending himself."

31.    The Houston Police department and Houston Police Officers Union work closely together. Many times hand and hand on matters, including investigation matters.

32.    The Houston Police Department, although silent, responded with the same position. Harris was given administrative leave with pay for over two years, while awaiting trial in Fort Bend County.

33.    Harris became acutely aware of the IAD investigation process when was arrested and charged after a previous instance of use of deadly force, involving the killing of Sylvanus Okhueleigbe.

34.    Harris also was investigated by IAD after a prior arrest for DWI.

35.    Anton Mawhood had been investigated by IA in the past as well, after an in death custody, ultimately determined to be a suicide, although he investigated and received minor discipline for.

36.    La Estancia failed to properly evaluate Harris before hiring him.

37.    La Estancia failed to properly evaluate Mawhood before hiring him.

38.    These supportive actions by HPD further emboldened, Harris.

39.    La Estancia only relies upon the fact that the Defendants held themselves out to be HPD officers alone.

40.    La Estancia does not check the officers' status to verify the officer is currently in good standing with the Houston police department.

41.    It relies on Michael Prause's recommendations and nothing more.

42.    Prause worked as a middleman throughout the term of the assignment.

43.    The officers report to and communicate, and are paid through Prause, and Prause reports to the complex.

44.    And the complex would give Prause instructions to convey to they the officers that worked off-duty at the complex.

45.    Even if La Estancia had conducted background search to determine whether the officers have engaged in conduct that could be of harm to the general public it still would have employed Harris.

46.    The employment was based solely its policy which allows any officer to be employed so long as they represent they are employed by HPD.

47.    La Estancia does not gain its off-duty officers from HPD directly, rather through a liaison. It pays all parties directly either cash or check, and provides

1099 tax forms.

48.     La Estancia hired Harris and Mawhood.

49.     Harris and Mawhood work for and get paid by the complex.

50.     On July 22, 2015, Defendant Thomas Loyd Harris, a Houston Police
Department officer and his partner Anton Mawhood were working a city-approved
extra job for apartments, through Guardian Equity Management.

51.     There was no training by HPD for work as an off duty officer working in
any capacity other than traffic, and at night clubs.

52.     The only oversight of off-duty officers working extra-jobs are  peers on the
off-duty assignment, and the general public.

53.     There was no oversight provisions in place of Harris and Mawhood while
working at La Estancia by City of Houston.

54.     There was no oversight provisions in place of Harris and Mawhood while
working at La Estancia by La Estancia.

55.     There were no training, rules, handbooks, guidelines provided by La
Estancia to Harris and Mawhood except they were required by La Estancia to wear
a HPD uniform while working off duty, which the officers followed.

56.     There were no training, rules, handbooks, guidelines provided by The City
of Houston HPD to Harris and Mawhood in working the extra job off-duty except

they are to obtain a work permit.

57.    Work Permits are granted from the City of Houston HPD supervisors of an officer wanting to work off-duty, unless the type of establishment is prohibited or if the officer is not eligible for off duty employment.

58.    The extra job employer does not require a permit, it is not involved in the permit process, and does not review the permits submitted.

59.    Neither La Estancia nor the City of Houston provided training to Harris after his return from being on administrative leave after killing Sylvanus Okhueleigbe on the employment of the use of deadly force while off duty.

60.    The failure to train or verify any training demonstrates beyond gross negligence to the health and safety of the general public and an unreasonable risk of harm by La Estancia.

61.    The failure train demonstrates deliberate indifference, and gross negligence to the health and safety of the general public by The City of Houston.

62.    Neither La Estancia nor the City of Houston supervised Harris after his return from being on administrative leave after killing Sylvanus Okhueleigbe on the off- duty employment.

63.    The failure to supervise demonstrates beyond gross negligence to the health and safety of the general public and an unreasonable risk of harm by La Estancia.

64.    On or about July 23, 2015, Helder Flores was visiting La Estancia Apartments, he went to La Estancia to see a friend of his mother's, Chebol.

65.    Chebol was not home, so Mr. Flores starting making his way from the apartments. While leaving the apartments, Mr. Flores ran into two friends that he knew, Daniel Vargas Negron, and Edward Cruz.

66.    Mr. Flores continued walking through the apartment complex with friends, witnesses, Daniel Antonio Vargas Negron and Edward Cruz.

67.    Mawhood and Harris were in a private vehicle located in the parking lot of La Estancia.

68.    Officer Harris notice Mr. Flores and his friends. He and his partner, Mawhood did not witness Flores committing any crime at that time.

69.    The off-duty officers rode up closer to the trio in Mawhood's Toyota Camry, a private vehicle.

70.    Before Mawhood, the driver, completely stopped the vehicle, Harris jumped out.

71.    He had both hands on his weapon pointing at Mr. Flores.

72.    Harris did not identify himself as an officer when he exited Mawhood's vehicle.

73.    Flores never saw Harris nor Mawhood in the vehicle.

74.    Neither Cruz nor Negron saw Harris or Mawood in the vehicle either.

75.    After jumping out of the vehicle, with his gun pulled, he then fired his weapon striking Mr. Flores in his mid-back area.

76.    Flores never saw Harris nor Mawhood after exiting the vehicle.

77.    Neither Cruz nor Negron saw Harris or Mawood after exiting vehicle either.

78.    Harris claimed to see Flores trotting through the parking lot of La Estancia with a gun in his right hand, holding it behind his right leg.

79.    Mawhood did not see Flores trotting with a gun in his hand.

80.    Neither Harris or Mawhood have 20/20 vision.

81.    Harris was pretty sure he had his contacts in but could not say for certain.

82.     Harris claimed Flores pointed the gun at him using his right hand.

83.    Mr. Flores is left hand dominant, since birth. He has a permanent injury to his right hand.

84.    Flores does not rely on the use of his right hand as his preferred hand.

85.    Flores had been shot in his right hand on a prior occasion, causing nerve damage.

86.    Neither Harris, Mawhood, nor others were threat of harm from Helder Flores.

87.    The only other witnesses to the event other than the parties are, Cruz and

Negron who both stated Flores did not have a gun in his hands at all.

88.    Mr. Flores never had a gun in either of his hands.

89.    Mr. Flores was never accused of pointing a gun or any weapon at Mawhood,

90.    Mr. Flores did not point a gun or any weapon at Harris.

91.    Mr. Flores did not point a gun or any weapon at anyone else.

92.    According to the only other witnesses, Cruz and Negron Harris did not announce he was an officer before shooting.

93.    Mr. Flores also stated Harris did not announce he was an officer before shooting.

94.    Harris did not announce he was an officer before shooting Mr. Flores.

95.    Neither, Daniel Vargas Negron nor Edward Cruz were accused of a crime by the officers, or alleged to be observed to be suspected of engaging in criminal activity.

96.    The defendant officers did not see Helder Flores in commission of a crime prior to shooting him.

97.    Plaintiff filed the state law petition on July 25, 2016, the pending criminal proceedings continued until Mr. Flores plead guilty to a reduced misdemeanor charge of unlawful possession of a firearm.

98.    Immediately after the resolution of the criminal case, The Harris County

District clerk served La Estancia Apartments a citation with the state petition. Service was completed on December 6, 2017.

99.    Despite shooting Flores in the back, HPD, Harris and Mawhood reported the shot to have struck Flores's front right shoulder.

100.    In a report, entitled, the "City of Houston Inter Office Correspondence," stated that Mr. Flores was "found to have one gunshot wound that entered his right shoulder and exited his upper right back."

101.    The allegation of the shot in the front right shoulder, supported the charge against Flores of aggravated assault of a police officer.

102.    After Flores was shot, he was left on the pavement bleeding out, no medical aid was rendered besides calling for emergency services.

103.    It was a hot July day, during daylight savings.

104.    Although neither Harris or Mawhood provided medical or life saving measures to assist the hemirroging Flores, Mawhood handcuffed Flores.

105.    The HPD trains its officers to handcuff individuals after the use of force despite injuries unless injuries to arms.

106.    After a gunshot wound every moment is critical.

107.    EMS was summoned for Helder Flores, but not until five minutes passed after being shot, and he was handcuffed.

108.   The call for emergency medical services was not the first response to mortally wounding Mr. Flores, other calls were made first.

109.   Harris radioed to dispatch, who in turn notified Houston Fire Department.

110.   Mr. Flores was transported to the hospital by EMS.

111.   The officers immediately called the HPD Union.

112.   The union notified and placed the officers in contact with an attorney.

113.   There is a 24-hour union attorney hotline number.

114.   Harris had become familiar with the protocol since he was arrested for a DWI, and again when he was arrested for the homicide of Sylvanus Okhuelbe.

115.   Officers remained on the scene following a shooting by HPD officer, until the attorney arrived.

116.   Harris was allowed to do a "walk-through" of the scene to explain what happened. Mawhood was also allowed to do a "walk-through" of the scene to explain what happened.

117.   The officers were not separated by order of investigation at anytime.

118.   No officer could report excessive

119.   Mawhood could not have contradicted Harris's account of events outside of the  if he wanted to without exposing himself to possible retaliation.

120.   A team of important members of the HPD and the HPD's homicide, crime

scene units, District attorney's office and Union attorney arrived.

121.   This team is collectively known as the "shoot team."

122.   The officer is accompanied by his attorney during the "walk-through" and the "walk-through" is not recorded, but audio or video.

123.   The "walk-through" is a matter of unwritten custom as there are no written protocols or procedures regarding the "walk through".

124.   While in route to the hospital Mr. Flores lost consciousness, flatlined and had to be resuscitated.

125.   The neighborhood where La Estancia is located is a high crime area, and there is high gang activity, and the reason why Mr. Flores felt the need to carry a weapon, for his protection, and no other reason.

126.   Mr. Flores next memory after being shot and losing consciousness, was waking up in the hospital believing that he was a victim of gang violence.

127.   He believed that a gang member must have shot him, because of the nature and reputation of the neighborhood.

128.   At the hospital, Mr. Flores was advised that La Estancia Apartments' off duty Houston Police officer had shot him.

129.   He was then made aware that he was being charged with assault of a public servant.

130.   He was unaware of the officer's identity until he went to court.

131.   Once Mr. Flores appeared in court he became aware that it was Thomas A. Harris who was responsible for shooting him.

132.   To date, Mr. Flores does not know what either officer looks like, only names.

133.   He has high anxiety when he sees HPD patrol officers.

134.   On August 11, 2015, Mr. Flores was formally charged with Aggravated Assault against a Public Servant in the 184th District Court. Judge Jan Krocker bond was set at $100,000.00.

135.   This charged based on the City defendants' information provide that Mr. Flores had pointed a gun at Harris and Harris shot Flores in the front shoulder in self-defense.

136.   The complaining witnesses, Harris, and Mawhood provided facts that Mr. Flores was shot in the shoulder.

137.   Neither Harris nor Mawhood ever indicated Flores was shot in the back, in their statements.

138.   Mawhood handcuffed Mr. Flores's hands behind his back, after Flores rolled onto his stomach at the command of Mawhood.

139.   Mawhood was able to see that Mr. Flores was shot in his back, and did not

have a wound in the front.

140.   The failure to train Harris by the City of Houston or La Estancia, along with it failure to seek or investigate prior instances of excessive use of deadly force allegation by La Estancia, was a foreseeable and highly predictable consequence that would result in subsequent excessive use of deadly force by Harris, and allowed Harris to use excessive force, shooting Helder Flores in the back while working as an office duty officer at La Estancia.

***Internal affairs investigation***,

141.   City of Houston's internal affairs department ("IAD") initiated an investigation after the shooting. Harris was the subject of the investigation, not Mawhood.

142.   IAD only obtained audio and video statements from Helder Flores, and his witnesses Daniel Negron, and Edward Cruz.

143.   IAD took written statements from Helder Flores, Daniel Negron, Edward Cruz, Thomas Harris, and Anton Mawhood.

144.   The internal affairs department did not contact anyone with La Estancia.

145.   Prior to taken the final written statement from Mawhood and Harris, it allowed each of them to review the written and recorded statements of Helder

Flores, Daniel Negron, and Edward Cruz, although Mawhood was not subject of the investigation.

146.   IAD is only required to provide the allegation statement, affidavit, or complaint, not the entire investigation file, under Chapter 143 of the Texas Local Government Code to the person subject to the allegation.

147.   IAD provided the entire investigation file to Mawhood and Harris prior to accepting their statements.

148.   IAD did not offer Helder Flores, Daniel Negron, or Edward Cruz, to review each others or Mawhood and Harris's statements at anytime.

149.   IAD did not required Harris and Mawhood undergo a recorded interview regarding the incident. The shooting of Mr. Flores was determined to be "justified."

150.   Harris and Mawhood were not separated prior to providing statements to IAD.

151.   Harris and Mawhood were not separated to provide  statements to IAD, in fact they were able to view each other's statements, although Mawhood was also classified as a witness and was not subject to the complaint.

152.   The IAD investigation that involves a shooting or a death automatically goes to the disciplinary committee. The disciplinary committee makes its

recommendations to the assistant chief at the time.

153.   The chief of police can make a final determination on whether or not discipline will be issued, but all discipline must occur within 180 of "discovery" of the officer's conduct.

154.   The City of Houston HPD chief of police McClendon decided not to discipline Harris or Mawhood in this case.

155.   When Harris jumped out of Mawhood's private vehicle before Mawhood had made a complete stop and alleged to announce he was a police officer and commanded Flores to drop his weapon, neither Mawhood or Harris saw Flores pointing his gun at any person.

156.   If Flores was indeed holding a weapon (looking as though he were acquiring a target), there was no authority for Harris to order Flores to drop the gun.

157.   Harris never saw the alleged "target" that Flores was focused on.

158.   Harris jumped out of the vehicle before it had stopped completely with his weapon drawn.

159.   There was no reason that Harris was in a rush to jump out of the moving vehicle with his weapon drawn to prevent harm of another at the hands of Flores.

160.   The off duty officers did not know Flores's identity until after the shooting.

161.   The off duty officers did not know whether Mr. Flores was a conceal carry

license holder until after the shooting.

### Criminal case allegations

162.   In the criminal case, Harris indicated that Flores was holding a gun in his right hand.

163.   Harris represented that he identified himself as an officer, he told Flores to drop the gun, but Flores did not drop the gun he looked at Harris, made eye contact with Harris.

164.   Harris further indicated, in the criminal case, that after making eye contact, instead of dropping the gun Flores turned his full torso to face the officers then pointed the gun in his right hand at officers.

165.   It was at that point  Harris shot Flores in his front shoulder.

166.   Additional investigation notes from the criminal case contradict these findings those notes indicate that Mr. Flores suffered "GSW to upper Left Area of Back."

167.   No other persons in the vicinity was in threat of harm by Flores, other than the officers, according to officers.

168.   On November 15, 2017, the Harris County district attorney dropped the charge of an assault of a public servant in exchange Mr. Flores pled guilty to

a misdemeanor charge of unlawful possession of a firearm.

169.   Defendant, City of Houston, provides its officers with training to become an officer.

170.   HPD Officers are trained in first aid at the academy as a part of their training requirements.

171.   HPD Officers are not required to perform first aid on individuals injured after the use of deadly force.

172.   Although trained, HPD Officers are not required to perform first aid on any injured individual they encounter, even children.

173.   HPD Officers are trained to handcuff individuals injured after the use of deadly force.

174.   Handcuffing is required even if there is no longer a threat danger to the officer by the handcuffed individual.

175.   Harris never changed his story that Flores was shot in his chest.

176.   Even after rolling Flores on his stomach to handcuff him, Mawhood never changed his story that Flores was shot in his chest.

177.   Neither provided an explanation why Flores was shot in his back by Harris.

***Gang Database Entry***

178.   On March 27, 2015, Flores was visiting with friends at Las America apartments, located at 5909 Glenmont Dr, Houston, TX 77081, in a heavily populated Latino community.

179.   They were in the complex barbequing and enjoying each other. Officers arrived on the private property and began questioning the individuals, although quite respectfully.

180.   They started having a little small talk with those in attendance, and asked if they would not mind if the officers took their photos. Most agreed, including Mr. Flores, but unbeknownst to them they were being added to the Gang Tracker Database.

181.   A fact concealed from Flores.

182.   Mr. Flores and other individuals were detained for the sole purpose to add them to the Gang Tracker Database, but were not noticed.

183.   Flores and the others were not stopped by HPD officers to investigate a crime, nor was not accused of a crime.

184.   During the investigatory stop made by HPD officers, they detained Mr. Flores without reasonable suspicion that any crime had been committed and proceeded to question him. Although the officers were friendly, Mr. Flores did not feel free to leave.

185.   Again, on October 19, 2017, after Mr. Flores had been shot by Harris and his criminal trial was pending he was stopped, detained, and searched by HPD officers.

186.   Flores was at the Las Americas Apartments dropping off his employees when he was stopped and detained by HPD officers in an attempt to further document him as a gang member.

187.   These HPD officers were not friendly, rather demanding. He was made to undress, by taking off his shirt, to allow the officers to analyze his tattoos to determine if they were gang related.

188.   Mr. Flores does not have any gang related tattoos.

189.   His tattoos depict many different women, and other City of Houston themed tattoos.

190.   During that investigatory stop made by HPD officers, they detained and searched Mr. Flores without reasonable suspicion that any crime had been committed, and certainly without probable cause to warrant a search without a warrant.

191.   The officers proceeded to question him, go through his pockets, get his keys, then search his vehicle without his consent, and take more photographs of Mr. Flores.

192. Again, Mr. Flores was not free to leave, and

193. Flores did not feel free to leave.

194. Mr. Flores was profiled because he his Latino, of Mexican descent, present in an area where gang members reside, and had tattoos despite the nature of the tattoos.

195. There are eight criteria used to determine that a person is a gang member and should be documented, but only two of any of the eight criteria must be met.

196. The eight criteria include:

> (i)  a self-admission by the individual of criminal street gang membership that is not made during a judicial proceeding, including the use of the Internet or other electronic format or medium to post photographs or other documentation identifying the individual as a member of a criminal street gang;

> (ii)  an identification of the individual as a criminal street gang member by a reliable informant or other individual;

> (iii)  a corroborated identification of the individual as a criminal street gang member by an informant or other individual of unknown reliability;

> (iv)  evidence that the individual frequents a documented area of a criminal street gang and associates with known criminal street gang members;

> (v)  evidence that the individual uses, in more than an incidental manner, criminal street gang dress, hand signals, tattoos, or symbols, including expressions of letters, numbers, words, or marks, regardless

of how or the means by which the symbols are displayed, that are associated with a criminal street gang that operates in an area frequented by the individual and described by Subparagraph (iv);

(vi)  evidence that the individual has been arrested or taken into custody with known criminal street gang members for an offense or conduct consistent with criminal street gang activity;

(vii)  evidence that the individual has visited a known criminal street gang member, other than a family member of the individual, while the gang member is confined in or committed to a penal institution; or

(viii)  evidence of the individual's use of technology, including the Internet, to recruit new criminal street gang members.

197.   The criterion *"individual frequents a documented area of a criminal street gang"* is an easy criterion to meet. In applying criteria, there is no consideration that a person may reside in a gang area with their families, or the motives of a "reliable informant or other individual" prior to entering a person into the gang database.

198.   Another criterion, is self-admission. The self-admitted statement does not have to be recorded or documented, the allegation alone is sufficient.

199.   There is no officer training required relating to gang database entry.

200.    Mr. Flores is not a member of any street gang.

201.   Mr. Flores does not have any gang tattoos.

202.   Although, he is a documented street gang member of two gangs, Houstone, and Southwest Cholos.

203.   Houstone is a prison gang, Mr. Flores has never been to prison.

204.   Mr. Flores was never in the commission of a gang crime, under CCP 461, or any crime during either stop documenting him as a member of two different gangs.

205.   The City of Houston has a policy that allows its officers to engage individuals to determine if they can identify any of the eight criteria, in violation of Terry v. Ohio.

206.   There is no requirement the HPD officer advise the individual they are being documented as a gang member, the individual be noticed of his entry into the gang tracker database as a documented gang member, or a requirement that the individual allowed to respond to the allegation.

207.   The HPD policy encourages officers to document members of African American and Latino communities, because although there are no accommodations or awards for such efforts the benefits come in the form of promotions, and acceptance into specialized units.

208.   Mr. Flores was entered in the gang tracker database for the first time in March 2015.

209.  He was not made aware at the time or after that he was being placed in the gang tracker database by HPD.

210.  No person that is placed in the gang database is entitled to know they have been placed in the gang tracker database.

211.  The database information is provided to potential employers, and local, state, and federal agencies, including court records use to enhance any crime outside domestic violence, and driving offenses.

212.  It was not until he was advised in the underlying criminal proceeding related to this case was he made aware that he was a documented "gang member."

213.  According to the "green card" information, Flores met 2 of the 8 criterion self admission, and being with known gang members.

214.  Houston Police gang division rarely find that non-minorities met the criterion for entry into the gang database, and have only identified three white gangs operating in the area, Aryan Brotherhood, Peckerwood, and, Aryan Circle.

215.  However, it is well known that the Aryan Brotherhood of Texas (ABT), Irish Mob, Dirty White Boys, White Knights of America, and the "White Knights," also operate in the City of Houston.

216.   There is no emphasis to place individuals that met the 2 of the 8 crierton in the gang database as members of non-minority gangs, although there are thousands of members of non-minority gangs in Houston.

217.   Entry into the database affects a person to obtain jobs, housing, and is used against them in court proceedings.

***Past HPD Police use of Deadly Force by Off Duty Officers, and failure to train officers in use of deadly force while off duty,*** *amounted to deliberate indifference by The city of Houston.*

218.   Prior to this shooting, from 2009-2014 there were 194 intentional police shootings of civilians, each shooting was determined to be justified after a HPD internal affairs investigation.

219.   HPD officers who worked off-duty were provided no training on the use of force while off duty by HPD.

220.   Even after Harris returned to work after his criminal trial he was not trained by order of the Chief of Police.

221.   A single violation of federal rights, shooting Mr. Flores in the back when he posed no threat to anyone, accompanied by a showing that a municipality has failed to train its employees, like Harris after returning to duty, to handle

recurring situations the use of deadly force presenting an obvious potential

violation  and municipal liability.

222.   HPD officers who worked off-duty were provided are not supervised

while working as off duty officers by HPD.

223.   An overwhelming percentage Off-duty HPD officers use of deadly force

has determined to be justified, in fact some also receive accommodations for

their actions with questions surrounding the true facts of the incident.

224.   The following are instances of off-duty officers use of deadly force in

particular that there has been no discipline after an internal affairs

investigation in response to the deadly use of force.

225.   Houston PD officer Thomas Loyd Harris (Defendant in this case) caused

the chokehold death of in Sylvanus Okhueleigbe, in 2009 in Fort Bend

County.

226.   Harris County grand jury has indicted a former Houston police officer

Jason Loosemore, 32, for an off-duty incident in 2016 where he shot and

wounded a neighbor following an argument over a dog.

227.   The DA's office announced Loosmore would be charged with aggravated

assault with a deadly weapon, he was not disciplined or fired, rather was

afford the opportunity to resign.

228.   Loosemore could not be fired immediately nor can any officer per the meet and confer agreement with the Houston Police Officer's Union.

229.   Houston PD officer S. Gromyko shooting Jamal Criss, on January 12, 2013, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

230.   Houston PD officer J. Seay shooting Shane Parrish and Eduardo Herrera while working security at a restaurant and bar, in September 2012, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

231.   Houston PD officer Fernando Meza shooting Jesse Brown while working off duty at the bus station, in May 2011.

232.   The Rice officer was fired after the incident, a move criticized by HPD's contracting partner HPDU, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

233.   Houston PD officer Dong Q. Hoang shooting Ciara Lee while at an apartment complex, in December 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

234.   Houston PD officers M. Campbell and R. Gibson and shooting Thenhan Tran Huynh, in December 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

235.   Houston PD officer Jason E. Rice, and shooting Gene Horace II in the back while working security at his apartment complex, in May 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

236.   Houston PD officer F. Briones and shooting Mario Hector Deanda II while the officer was working security at a club, in January 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

237.   Houston PD officer Ryan G. Gardiner who shot John Barnes while the officer was working off duty at an apartment complex, in August 2009, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

238.   Houston PD officer S. De La Cruz who shot Jasmine L. Flowers while the officer was working off duty at a nightclub, in 2009, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

239.   Houston PD officers C.M. Holloway, D.M. Rodriguez, D.D. Moore and P.F. Karmout who shot Travis Balko while the officer was working off duty at an apartment complex, in February 2009, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

240.   Houston PD officer T.B. Cooper who shot Travis A. Chambers while the officer was working off duty at an apartment complex, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

241.   Houston PD officer Richard Martinez who shot J. Varges while the officer was working off duty at an apartment complex, in December 2007, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

242.   Houston PD officer Sgt. K.D. Anthony who shot James Edward Smith while the officer was working off duty at an apartment complex, in December 2006, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

243.   Houston PD officer J. Medina who shot Freddy Gutierrez, in September 2013, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

244.   Houston PD officer J. Fisher who shot Kenny Detrellis Montgomery, in February 2013, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

245.   Houston PD officer S. Hope, Grandon Xavier Murray, January 2013, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

246.   HPD officer Lareau who shot Klekar, in August 2012, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

247.   Houston PD officers Kevin Smith who shot Carmen Martin, in May 2012, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

248.   Houston PD officers W.T. Blevins and B.N. Graham who shot Hector Lopez Jr., in February 2012, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

249.   Houston PD Sgt. M. Dillingham who shot Joshua Williams, in December 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

250.   Houston PD officer Julio Lopez who shot Clemente Vela, in December 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

251.   Houston police officer Lisa Scharf who shot Dennis Glenn August 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

252.   Houston PD officer C.E. Hightower who shot Edgar Ramirez, In July 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

253.   Houston PD Sgt. A. Elizondo who shot Juan Jaimes, in May 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

254.   Houston PD narcotics officer S.O. Bryant who shot Kenneth Wayne Thomas, in March 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

255.   Houston PD officer Jose Coronado who shot Omar Ventura, and Rolando Ventura, in February 2011, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

256.   Houston PD officer R.O. Carreon who shot Rogelio Rodriguez, October 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

257.   Houston PD officer J.L. Falcon who shot Amin Rocha, September 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

258.   Houston PD officer S.C. Lameyer who shot Allen, in 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

259.   Houston PD officer Rafael Baez, Jr., who shot Clevontae Reynolds, in April 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

260.   Houston PD officer who shot Faustin Espinoza , in April 2010, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

261.   Houston PD officers F. Briones who shot Mario Hector Deanda II, in 2009, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

262.   Off duty and in plain clothes Houston PD Sgt. Charles W. Jones who shot Tim Stokes, April 2008, there was no discipline for excessive use of force or any training required despite an internal affairs investigation.

263.   Off duty HPD J. Castro shot and killed Jordan Baker in January 2015.

264.   All of the above named  off duty officers were investigated for the use of deadly force.

265.   None of the above named off duty officers were disciplined or received a citation by the City of Houston after the use of force even when the force was excessive, or unreasonable.

266.   Many remain employed with the Houston Police Department.

## NATURE OF THE CASE

267.   This action arises under the Fourth and Fourteenth Amendments of the United States Constitution, under federal law specifically 42 USC § 1983, 1985, 1988, and Texas State Law.

268.   Plaintiff alleges violations of the following constitutional rights:

269.   Fourth  and  Fourteenth  Amendment  protection  against  excessive  force;

and his right to be free from cruel and unusual punishment;

270.   Fourth and Fourteenth Amendment protection against unlawful seizure and detention

271.   Fourteenth Amendment right to equal protection

272.   Fourteenth Amendment right to medical care; and, Section 1981 protection against race discrimination.

273.   Mr. Flores brings these through 42 U.S.C. Section 1983, against Thomas Harris and Anton Mawhood, and the City of Houston.

274.   Mr. Flores is seeking recovery and redress for violations of constitutionally protected civil rights from Defendants Mawhood, Harris, and the City of Houston.

275.   Mr. Flores is seeking recovery and redress from Defendant La Estancia, and 2012 Multi-Family Real Estate Fund under general negligence, premise liability, negligent training, negligent supervision, and retention.

## CLAIMS FOR RELIEF

276.   Regarding all claims, City of Houston Waives Governmental immunity when a personal injury occurs as a result of a tortious act that is not intentional, and involves the use of tangible city property, in this instance a City of Houston issued duty weapon, a Glock 22/.40 caliber semi-automatic

handgun, number DWD259US, and bullet ammunition.

## Count 1- Negligence

277.     Each of the preceding Paragraphs in this petition are incorporated herein as if restated fully. At all times material, hereto, Defendants, La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC, (Collectively "La Estancia Apartments") were the owners, and/or possessors of the premises at Plaintiff entered defendants' premises as a guest, and temporary resident on July 22, 2015.

278.     Defendants La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC, hired Defendants, Harris, and Mawhood as City of Houston Police Officers to secure the premises, and act as security officers.

279.  Defendants, La Estancia Apartments had a duty to use ordinary care to ensure that the premises did not present a danger to plaintiff, as a guest.

280.  This duty to protect the Plaintiff, a duty to take whatever action is reasonably prudent to reduce or eliminate an unreasonable risk of harm which it has actual or constructive knowledge of.

281.  A duty to take whatever action is  reasonably prudent to reduce or eliminate an unreasonable risk of harm created by its activity on the premises,

282.   A duty to eliminate an unreasonable risk of harm created by a premises condition about which the property owner new or should have known.

283.   An owner or occupier of land must use reasonable care to protect guest from known conditions that create an unreasonable risk of harm and conditions that should be discovered by the exercise of harm and conditions that should be discovered by the exercise of reasonable care, the duty to train, and the duty to warn or to cure. Because of the Plaintiff's status as a guest, La Estancia Apartments owed him a duty to exercise ordinary care to provide adequate security on the premises.

284.   La Estancia Apartments knew or should have known of the unreasonable risk posed to those on the premises while untrained Officers, Mawhood, and Harris remained on the premises since they were employed as a contract employees of La Estancia Apartments.

285.   The officers conduct on the date which made basis for this suit was foreseeable based its failure to train the officers on the recent but previous criminal conduct which occurred on and around the Apartments' property which included crimes similar to that Plaintiff was concerned about.

286.   La Estancia Apartments were aware of the criminal conduct because they hired the officers based on these concerns, but failed to conduct a

background check, request disciplinary files of these officers, conduct a simple google search or interview the officers directly.

287.  They also failed to properly train the officers. It relied solely on any possible law enforcement training, verified by the fact they were currently employed by HPD.

288.  La Estancia Apartments had a duty to protect Mr. Flores from an unreasonable risk of harm but breached this duty in allowing the same officer that just killed another person to work on its premises, after he had already demonstrated himself to be a risk to the general public.

289.  La Estancia Apartments Defendants' conduct, and that of its agents, servants, and employees, acting within the scope of their employment, constituted a breach of the duty of ordinary care owed by La Estancia Apartments' to the Plaintiff La Estancia Apartments' knew or should have known that the condition on its premises created an unreasonable risk of harm to invitees and guest .

290.  La Estancia Apartments' knew that the officer needed training but failed to do so, and relied on the presumption that the officers had been trained by HPD for the use of deadly force which they had not been trained.

291.  La Estancia not only failed to verify Harris and Mawhood's training

records,

292.   It failed to verify whether they were actual officers at the time to hired the officers.

293.   It failed to verify the status of the officers at the time it hired the officers.

294.   It had no direct contact with City of Houston's Houston Police department.

295.   It only had contact with another officer Mike Prause, its coordinator.

296.   Its management's company coordinator Mike Prause  contacts officers to work on the property that he coordinates.

297.   The city of houston has no involvement in placing its officers in off-duty employment.

298.   A private person or entity cannot request an officer for off-duty work by contacting the City of Houston directly. A person would have to be referred to a private coordinator or hope an officer that answers the line could help with the request,

299.    A private person or entity can obtain an officer for off-duty work by contacting the City of Houston.

300.   As a result of the lack of adequate security, and La Estancia Apartments' actions, Helder Flores was injured by La Estancia Apartments' agents.

## Count 2-Vicarious Liability

## (This Count is not asserted against the City of Houston, Defendant Harris, or Defendant Mawhood)

301.   Each of the Paragraphs in this petition is incorporated as if restated fully herein. At all times material hereto, Thomas L. Harris, and Anton M. Mawhood, were the employees of Defendants, La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC,. At the time of the occurrence Thomas L. Harris, and Anton M. Mawhood's actions were within the scope of his employment with La Estancia Apartments, and 2012 Multi-Family Real Estate Fund, LLC.

302.   City of Houston's general orders describe those who utilize off duty officers as employers.

303.   Accordingly, Defendants, La Estancia Apartments, and 2012 Multi-Family Real Estate Fund, LLC, are vicariously liable for the acts of Thomas L. Harris, and Anton M. Mawhood, for the causes of action above.

304.   Only an off-duty police officer who observes a crime immediately becomes an on-duty police officer.

305.   Harris did not observe Mr. Flores commiting a crime, when he shot Mr. Flores, he was not acting in his public capacity at the time he committed the

unconstitutional act, and he was not responding to a crime.

306.  Although, the officers were engaged in providing security at their employer's property, ejecting trespassers, enforcing laws and regulations promulgated by the employer La Estancia, La Estancia failed to give any instructions or directions to or properly train Defendants, Harris and Mawhood as to how to provide property security measures at the premises.

307.  In committing the acts alleged in the preceding paragraphs, Defendants Harris and Mawhood acted at all relevant times within the scope of his employment with La Estancia Apartments. La Estancia Apartments, as principal, is liable for all torts committed by its agent in the scope of his employment, including those of Defendants Harris and Mawhood.

**Count 3-Premises Liability of La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC(This Count is not asserted against the City of Houston, Defendant Harris, or Defendant Mawhood).**

308.  Each of the Paragraphs in this petition is incorporated as if restated fully herein. La Estancia Apartments, 2012 Multi-Family Real Estate Fund, had control over the premises in question that Defendants owed certain duties to Mr. Flores, the breach of which proximately caused the injuries set forth

herein.

Defendants, La Estancia Apartments, and 2012 Multi-Family Real Estate Fund,LLC, owed Plaintiff the duty to provide a safe environment, free of any potential for a reckless conduct resulting in bodily injury. This includes the duty to protect Plaintiff from unreasonable risks of harm or to warn him of the risks so that he may avoid them, and they duty not to injure him willfully Wantonly, or through gross negligence.

309.   Defendants La Estancia Apartments, and 2012 Multi-Family Real Estate Fund,LLC, Defendants' agents, servants, and employees negligently permitted aggressive conduct by employees to occur on their premises and created an unreasonable risk of harm to their invitees.

310.   Plaintiffs would further show the court that the unreasonably dangerous condition existed, in allowing the untrained security officers to patrol and remain in the premises without adequate supervision.

**Count 4-Defendants, La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC, Negligent Hiring, Training, Supervision, and Retention (This Count is not asserted against the City of Houston, Defendant Harris, or Defendant Mawhood).**

311.   Each of the Paragraphs in this petition is incorporated as if restated fully

herein. La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC, had a duty to exercise the degree of care that a reasonably careful person would use to avoid harm to others under as the facts described herein.

Plaintiff's injuries were proximately caused by La Estancia Apartment Defendants' negligence, carelessness and reckless disregard of said duty and were negligent in failing to use ordinary care in hiring, supervising, training and retaining employees.

312.   The negligent, careless and reckless disregard of duty of Defendants, 2012 Multi-Family Real Estate Fund, LLC, and La Estancia of at minimum failing to use reasonable care in hiring employees, ordinary care in supervising its employees, reasonable care in retaining its employees, and reasonable care in training its employees, jointly and severally, separately and collectively was the proximate cause of Plaintiff's injuries and damages.

313.   2012 Multi-Family Real Estate Fund, LLC, and La Estancia  owed a duty to the general public, including Mr. Flores, to ascertain the qualifications and competence of the employees it hires, here Harris and Mawhood, especially when the employees are engaged in occupations that require skill or experience and that could be hazardous to the safety of others, like security.

314.   There are clear facts that show that Harris's history of use of deadly force, and misidentifying items as weapons, which resulting in him killing an unarmed black man who he claimed to have had a weapon, would be a risk to residents of or visitors to La Estancia.

315.   He had no specific duties at the complex and could just roam around and do what he felt necessary.

**Count 5–Negligence of Defendant, Thomas Lloyd Harris**

316.   Each of the Paragraphs in this petition is incorporated as if restated fully herein. In the alternative to the constitutional claims, Plaintiff brings his negligence claim against Defendant, Thomas Harris. That on the occasion in question, Defendant, Thomas L. Harris, was guilty of numerous deliberate indifferent acts and/or omissions of negligence including, but not limited to the following:

317.   Failing to prevent injury to others when it reasonably appeared or should have appeared that in the exercise of his lawful rights others may be injured by a dangerous condition that was created by him. he failed to exercise reasonable care to avoid a foreseeable risk of injury to Mr. Flores, take affirmative action to control or avoid increasing the danger from a condition

that had been at least partially created by his conduct, or use ordinary care in

aiding or protecting others from peril when the peril was under his control.

All of the foregoing acts and/or omissions, jointly and severally, separately

and collectively are the proximate cause of Plaintiff's injuries and damages.

In the event The City of Houston files a Motion to Dismiss state claims

against Thomas L Harris, City of Houston waives immunity when a personal

injury occurs as a result of a deliberately indifferent tortuous act that and

involves the use of tangible city property, in this instance a bullet.


## Count 6 – Texas Constitution- Texas Constitutions Article I, Section 19

### (This Count is not asserted against La Estancia Apartments, 2012

### Multi-Family Real Estate Fund, LLC.)

318.

Each of the Paragraphs in this petition is incorporated as if restated fully

herein. Under, Texas Constitutions Article I, Section 19, Deprivation of Life,

Liberty, Etc. due course of law. No citizen of this State shall be deprived of

life, liberty, property privileges or immunities, or in any manner

disfranchised, except by the due course of the law of the land.  Mr. Flores

posed no threat of danger to Officer Harris or Mawhood. Helder Flores was

deprived of liberty by the gunshot inflicted upon him by Officer Harris without justification, unreasonably and with excessive force.

**Count 7- Federal Constitutional Violations (This Count is not asserted against the La Estancia Apartments, 2012 Multi-Family Real Estate Fund, LLC).**

319.

Each of the Paragraphs in this petition is incorporated as if restated fully herein. As described in the preceding paragraphs, Defendants, Harris Mawhood, and City of Houston actions toward Mr. Flores violated his constitutional rights, 42 USC Sec. 1983, under the fourteenth and fourth amendment to be from illegal search and seizure, excessive force, equal Protection, after being wrongfully accused and incarcerated while recovery from a gunshot wound. He had to hire three different attorneys to defend against the baseless charges of assault on a public servant, brought by Defendants, Thomas, Mawhood, and City of Houston.

320.   City of Houston Police Department officers, Thomas L. Harris, and Anton M. Mawhood, were engaged in protecting Defendant, La Estancia Apartments, property ejecting trespassers, and enforcing state and local laws and regulations within the premises promulgated by Defendants, La Estancia

Apartments, and 2012 Multi-Family Real Estate Fund, LLC.

The City of Houston waives immunity when the negligence of its officers in the use of the city of Houston's tangible property, city issued duty weapon and ammunition, a bullet that caused Mr. Flores injury and to lose one of his lungs.

## Count 8- 42 U.S.C. § 1983 Excessive Force

321.   As described in the preceding paragraphs, Defendant Harris's actions toward Helder Flores violated his constitutional rights, under the Fourth and Fourteenth Amendments of the United States Constitution, including but not limited to the misconduct described in this Count was objectively unreasonable and undertaken with deliberate indifference to the rights of others.

322.   In addition, the misconduct and excessive force described in this Count "shocks the conscience."

323.   A reasonable officer would have known that shooting Mr. Flores in the back violates his constitutional right to be free from unreasonable seizure. The

action were not objectively reasonable because the officers shot a man in the

who did not pose a significant or immediate threat of death or serious physical injury to the defendants or others, in doing so Defendants, under this count violated Mr. Flores clearly established constitutional right at the time [1]

324.

**Count 9- 42 U.S.C. § 1983 Equal Protection**

325.   Each of the Paragraphs in this petition is incorporated as if restated fully herein. Defendants, Harris Mawhood, and City of Houston violated Plaintiff's

constitutional rights by subjecting him to unlawful, unequal treatment on the basis of his race in violation of the Fourth and Fourteenth Amendment of United States Constitution. Defendants, Harris Mawhood, and City of Houston conduct created discriminatory effect by targeting Mr. Flores for police action based on his race.

326.   He was placed in the Defendant, City of Houston's Gang Tracker Database without due process of law based solely on his race. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Mr. Flores's

---

[1] Graham v. Connor, 490 U.S. 386, 392-99 (1989)(excessive force)

constitutional rights.

Defendants have waived sovereign immunity because the officers' actions were not objectively reasonable. In shooting Mr. Flores, failing to render medical treatment, and delaying in summoning emergency responding medical personnel, Defendants violated clearly established constitutional rights of Mr. Flores. A reasonable officer would have known that shooting Mr. Flores in the back violates his constitutional right to be free from unreasonable seizure. The Defendants' action were not objectively reasonable because the officers shot a man in the back who did not pose "a significant threat of death or serious physical injury to the defendants or others.

### 327.   Count 10- 42 U.S.C. § 1983 Failure to Provide Medical Care, Delay in Medical Care

328.   Each of the Paragraphs in this petition is incorporated as if restated fully herein. Defendants, City of Houston, Harris, and Mawhood's actions toward Helder Flores violated Helder Flores's constitutional rights, including but not limited to the Fourth and Fourteenth Amendments of the United States Constitution due to his failure to render any medical care to Helder Flores after having detained him, pretrial, after shooting him in the back, and

delayed in summoning emergency services of Plaintiff suffered life threatening injuries, by leaving him injured and handcuffed on the hot pavement.

329.  Further, Defendants have waived sovereign immunity because its policy not encouraging its officers to render medical aid other than call for emergency services was the moving force of its officers' actions which were not objectively reasonable. In shooting Mr. Flores, failing to render medical treatment, and delaying in summoning emergency responding medical personnel for more than 20 minutes after Helder Flores as wounded.

330.  Defendants violated clearly established constitutional rights of Mr. Flores. A reasonable officer would have known that shooting Mr. Flores in the back violates his constitutional right to be free from unreasonable seizure, a right well known by defendants on the date of the claim accrued.

331.  The Defendants' actions were not objectively reasonable because the officers shot a man in the back who did not pose "a significant threat of death or serious physical injury to the officers or others. The misconduct described in this Count was objectively unreasonable and with deliberate indifference to Helder Flores's constitutional rights.

**Count 11 -Monell Claims- Policy, Practices, Custom and Procedure**

## Ratification, and or adoption

332.   Each of the Paragraphs in this petition is incorporated as if restated fully herein. As result of City of Houston customs, policies, and practices it encourages the above constitutional violations, and is thereby the moving force behind, the very type of misconduct at issue by failing to adequately train, supervise, control and discipline its officers, including Harris and Mawhood such that its failure to do so manifests deliberate indifference by such officers.

333.   As a matter of custom, policy and practice, the City of Houston facilitates the very type of misconduct at by failing to adequately investigate, punish, train, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized.

334.   The City of Houston encourages future use of excessive deadly force; unlawful detentions; failures to intervene; the delay of medical care, in handcuffing critically injured individuals and failing to immediately perform lifesaving measures, failing to immediately summoning emergency medical care, after causing life threatening injuries; and race based policing such as those Plaintiff complains by placing unsuspecting Latinos, and African

Americans in gang databases that affect their ability to gain employment, and enhance the range of punishment for crimes accused of in criminal court proceedings.

335.   Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Houston Police Department violate the constitutional rights of individuals in a manner similar to that alleged by Helder Flores, herein, on a regular basis, yet the Houston Police Department investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

336.   As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of the Defendant Harris, and Mawhood, Plaintiff has suffered physical injuries, mental anguish, and severe emotional distress.

337.   The misconduct by the defendants described in this Count was objectively

unreasonable and undertaken with willfulness and reckless indifference to the rights of others. In addition, the misconduct and excessive force described in this Count "shocks the conscience."

338.   Over FOUR HUNDRED (400) HPD officers have been involved in the

killing or wounding of civilians since January 1, 2004 yet only one HPD

officer, Jason

Loosmore, has been indicted when HPD Homicide Division's collected

evidence and conclusions were presented to a Harris County Grand Jury.

Furthermore, there is no evidence that since January 1, 2004 a single HPD

officer, including Loosmore, has been disciplined for a City policy violation

due to shooting a civilian after the HPD Internal Affairs Department

investigation into the shooting.

339.   About 25% of these shootings involved citizens with no weapons or

threat of harm.

In December, 2016 new Houston Police Chief Acevedo stated he was

creating a special HPD unit apart from homicide to investigate situations

such as shootings of civilians. As mentioned above, Harris County grand

jury has indicted a former Houston police officer for an off-duty incident in

2016 where he shot and wounded a neighbor following an argument over a

dog, the DA's office announced Jason Loosmore, 32, is charged with

aggravated assault with a deadly weapon. This was the first officer indicted

since 2009.

340.   On October 1, 1998, HPD Officers Anthony M. Ruggeroli and Brian T.

Mitchell shot at suspects in a stopped car when they did nothing more than not respond immediately to verbal commands. Officer Ruggeroli merely shouted a few commands then left cover and went to the passenger window and shot at the unarmed driver. Officer Mitchel than ran up to the passenger window and smashed it and grabbed the passenger. The officers were not disciplined for using excessive force nor retrained in use of force or the proper high risk vehicle approach tactics, indicating ratification and acceptance of patterns, practices, customs and/or procedures of the excessive use of force.

In 1999, HPD Sgt. Glover's gun went off and struck a suspect when he used it to bash in passenger side window. Officer Shockley then discharged his weapon striking the other suspect in the vehicle. Despite using excessive force on both suspects and failure to use safe high risk vehicle approaches and full IAD investigation, there was no discipline or retraining as a result of this incident, indicating ratification and acceptance of HPD's excessive use of force and dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, and customs.

341.  In 1999, Jason Arboleda was shot and killed by HPD Officer R. A. Williams. Jason had left a bar with his friend Franky Aguirre, who was a

passenger. On the way out from the area, he struck but did not seriously injure, Officer R. A. Williams. Officer Williams then chased after Mr. Arboleda on foot and stopped him at a traffic light as Jason tried to flee in his vehicle. Officer Williams ordered Mr. Arboleda out of the car and on to the ground to which Mr. Arboleda complied. At that point, Officer Williams did not handcuff or otherwise secure Mr. Arboleda, who then jumped back in his car.

342.   The officer ran to the front of the car instead of obtaining cover. As Mr. Arboleda drove forward, Officer Williams shot and killed Jason.

343.   Officer Williams was not hit by the car and even felt safe enough to shoot rather to spend time getting out of the way. Despite IAD investigation, Officer Williams was not disciplined or retrained in the use of excessive force or high risk vehicle approach. The City determined it was a justified shooting and it never addressed Officer Williams' failure to follow either the written HRVA policy or any safe HRVA method. Further, the City did not order any training, indicating ratification and acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures and use of force.

344.   In 2000, HPD Officer R. C. Headley stopped a vehicle and determined it

was

stolen. Officer Headley then shot Mr. Langston (driver) and Mr. Plumbar (passenger) when there was no reason to do so. Neither person was armed. Despite IAD investigation, there was no discipline nor training ordered.

345.   In 2000, Officer Selvyn J. Ellis, who had 47 sustained complaints against him, received a suspension instead of firing, despite the fact he refused to answer questions during an IAD inquiry into improper conduct, including allegations of assault. He had previously been suspended for injuring a bar patron while working an extra job and not reporting the use of force.

346.   In 2002, Officer Ted A. Adams, who has 41 sustained complaints against him, received a one day suspension instead of firing for not reporting the use of force after injuring a female after knocking her to the pavement with a leg sweep.

347.   In 2003, Houston Police Lieutenant Hillman was involved in a faulty high risk vehicle approach and used excessive force against unarmed Kevin Lunsford. When Hillman got near Lunsford he claimed that Lunsford moved and then Lt. Hillman shot and killed Lunsford. Despite IAD investigation, there was no discipline for excessive use of force or any training required.

348.   On October 31, 2003, HPD Officer Butler was working at a large AMC

movie theater in west Houston when 15 year old Jose Vargas was purportedly playing his radio too loud in his vehicle on his way to see a movie with his three teenage friends. Officer Butler went to investigate and the kids left. Officer Butler claimed the kids did not obey his commands to stop so Butler then gave pursuit. Vargas was scared and drove off.

349. Officer Butler rushed up to the vehicle on foot when it was stopped in traffic with his gun drawn and not under any cover. This startled the 15 year old unarmed Vargas and the vehicle lurched forward with Officer Butler at the side of the driver's window. Officer Butler then shot and killed Vargas. Vargas had no criminal history. Despite the obvious excessive use of force and IAD investigation, Officer Butler was not disciplined nor retrained in the use of force.

350. In 2003, Mr. Juan Lozano was killed because HPD Officer R. L. Plotner used faulty high risk vehicle approach techniques by approaching a vehicle and failing to get under cover and give verbal commands to Lozano in a vehicle after a pursuit. Without being in fear of his life or serious bodily injury, Plotner shot and killed Juan.

351. This officer was not disciplined or retrained in proper high risk vehicle approach tactics nor excessive use of force, indicating ratification and

acceptance of HPD's dangerous and unconstitutional high-risk vehicle approach (felony stop) patterns, practices, customs and/or procedures similar to those that killed Roland.

352.   In 2003, HPD Officer Rivera made a stop of a felony suspect in a van. Instead of gaining cover and shouting verbal commands, Officer Rivera left cover and the van exposed. Officer Rivera shot the van driver when he was not frightened for his life. Officer River, however, should have maintained cover and a position of advantage. Officer Rivera was not disciplined or retrained for use of excessive force despite IAD investigation.

353.   In 2004, HPD Officer C. Pena Jr. shot and seriously wounded an unarmed 16 girl who was under a vehicle. Officer Pena gave verbal commands to

LaDonna Banks and then shot her. Officer Pena received no discipline and no training in gaining cover when dealing with suspects and his use of excessive force.

354.   In 2005 HPD Officer Thompson used faulty high-risk vehicle approach techniques and excessive force resulting in the shooting of an unarmed suspect, Timothy M. Thomas, who was driving when Officer Thompson pulled him over. Officer Thompson became suspicious because the driver

was black and he had heard of a black felony burglary suspect. At first, Officer Thompson was behind cover and using his bullhorn. This only lasted a few minutes and then the officer left his cover and approached the vehicle with his gun drawn. Mr. Thomas started to get out of the car and when he did, he was shot by Officer Thompson who said he was in fear of his life due to Mr. Thomas' innocent movements. Thomas had no gun. Officer Thompson obviously used excessive force and faulty high risk vehicle approach. Officer Thompson was not disciplined and there was no training despite a full HPD IAD investigation.

355.   August 14, 2007, a 17-year-old unarmed girl was seriously wounded because of faulty high risk vehicle approach. Brittanee King, 17, was a littering suspect who had fled in a car for a short distance and was pursued by HPD Officer Carraway approached her with gun drawn. When Brittanee stopped the vehicle to comply with the officer, Officer Carraway failed to use safe HRVA methods and left cover and exposed himself in full view of the young unarmed girl in the car. When the unarmed Brittanee made an innocent movement, Officer Carraway claimed he feared for his life because he was not behind cover and in a position of advantage and shot Brittanee, wounding her. Officer Carraway claimed he saw a shiny object--Brittanee

was wearing shiny bracelets. Despite the admission of unsafe HRVA approach methods and use of excessive force, no discipline or training was administered despite an IAD investigation

356.   In 2008 Charles Chukwu was arrested and taken to the City of Houston jail at Mykawa Road where he was beaten by at least one City of Houston jailer without any reason. After the beating, Mr. Chukwu was purposefully released before he could get the names of the jail inmate witnesses. The jailers failed to File a timely use of force report and did not stop the beating of Mr. Chukwu, nor did the Houston jailers report another Houston jailer for the obvious excessive force.

357.   The jailers refused to take Mr. Chukwu to the jail clinic or hospital where the injuries could be documented, despite the excessive use of force and obvious injures. The Chukwu incident was caught on videotape and investigated by the IAD. It failed to find any violation when, in fact, excessive force had been used against Mr. Chukwu. Mr. Chukwu asked for the videotape from former City Mayor Bill White, Houston City Council and the HPD IAD, but was refused.

358.   At a Houston City Council meeting, Councilman Adrian Garcia stated that the videotape should be released. City Council member Sue Lovell

asked the HPD about the Chukwu jail beating video, however, she apparently never received a copy of the Chukwu video. More than two years after the alleged beating, Mr. Chukwu has not received the beating videotape.

359.   On June 22, 2008, Henry Lee Madge was struck several times while in handcuffs by a Houston police officer without justification and the officer was not disciplined.

360.   Around February 6, 2009, Trenton Garrett was arrested and taken to the Houston jail at Mykawa Road where City of Houston jailers beat him without any reason. The jailers failed to file a timely use of force report and did not stop the beating of Mr. Garrett, nor did the Houston jailers report another Houston jailer for the obvious excessive force. The jailers refused to take Mr. Garrett to a hospital where the injuries could be documented despite the excessive use of force and obvious injures. The incident was caught on videotape and investigated by the Houston IAD which failed to find any violation, when in fact, excessive force had been used against Mr. Garrett. Mr. Garrett asked for the videotape from the HPD IAD but was refused.

361.   More than two years after the alleged beating, Mr. Garrett has not

received the beating videotape.

362.   On August 5, 2009, Hatice Cullingford, Ph.D. ("Dr. Cullingford"), 65, was  by the Houston Police Department. Dr. Cullingford had never been convicted of any crime in her life and never previously been arrested for any crime.

363.   At the City of Houston Mykawa jail, Houston jail employees used excessive force on Dr. Cullingford yet no discipline resulted.

364.   In the late Spring of 2010, 15 year old Chad Holley was purposefully struck by a Houston police squad car and then violently beaten--by kicking, stomping and punching in the head, groin and other parts of his body--by least four Houston police officers while other Houston police officers looked on without intervention. Chad Holley was not resisting but had laid down on the ground with his hands behind his back. No officer attempted to stop the beating by the other officers and after the beating no officer reported any other officer for the incident. No use of force report was filled out by any officer in a timely manner.

365.   The Mayor of Houston, Annise Parker, thereafter, would not allow the release of a videotape showing the incident to the public.

366.   In February, 2011, a videotape of the Chad Holley beating was released

to local Houston television station KTRK, Channel 13, by a Houston citizen. Houston City Mayor Annise Parker then threatened the citizen and berated KTRK Channel "Whoever provided the video to Channel 13 is in violation of a federal court order and should be prosecuted." The citizen was not a party to the lawsuit nor was any protective order directed at the citizen.

367.  On February 8, 2011, at a Houston City Council public meeting discussing the Chad Holley excessive force incident and past police excessive force incidents, Houston City Attorney David Feldman interrupted Houston City Councilpersons, such as Melissa Noriega, who were talking about the videotape of Holley and past instances of police brutality that could affect city liability. Mr. Feldman then instructed the City council to not to talk about the Chad Holley case.

368.  This was a sentiment Mayor Parker also verbalized. Council member Noriega agreed and stopped talking about excessive force events as did the Mayor and other City Councilpersons.

369.  For the past twenty years there have been excessive force cases against the City pending at all times, so under this policy the council members cannot speak about excessive force cases in public meeting.

**DEFENDANTS WAIVER OF SOVEREIGN IMMUNITY**

370. Each of the Paragraphs in this petition is incorporated as if restated fully herein. Defendants have waiver qualified and sovereign immunity regarding each and every Count against the government and its actors in this complaint because the defendant officers' actions were not objectively reasonable.

371. In shooting Mr. Flores, failing to render medical treatment, and delaying in medical treatment by failing to take any life saving measures and delaying in summoning emergency responding medical personnel, Defendants violated clearly established constitutional rights of Mr. Flores.

372. A reasonable officer would have known that shooting Mr. Flores in the back when he did not pose a threat of harm to others violates his constitutional right to be free from unreasonable seizure.

373. The Defendants' Harris and Mawhood's actions were not objectively reasonable because the officers shot a man in the back who did not pose a significant threat of death or serious physical injury to the officers or others, then misrepresented the facts causing him to have to recover from his serious injury from a jail cell after the district attorney accepted charges of aggravated assault of a public servant.

374. In unlawfully searching and seizing Mr. Flores in violation of the fourth amendment, and placing Mr. Flores in the gang track database, without an

opportunity to be heard, failing to render medical treatment, and delaying in medical treatment by failing to take any life saving measures and delaying in summoning emergency responding medical personnel, Defendants violated clearly established constitutional rights of Mr. Flores.

375.   A reasonable officer would have known that searching and detaining Mr. Flores without so much as reasonable suspicion that he had committed a crime in an effort to document him as a certified gang member without giving him the opportunity to be heard violates his constitutional right to be free from unreasonable seizure, and due process.

376.   The Defendant officers under the color of law pursuant to a policy, custom and practice set forth by the City of Houston to delay medical care after causing an individual's injury and placing the individual in the custody of the City of Houston,

## **DAMAGES**

377.   Each of the Paragraphs in this petition is incorporated as if restated fully herein.

378.   Declaratory Relief- Removal from the HPD Gang Tracker database

Helder Flores is a business owner, a business that is flourishing and should not be jeopardized due to him being denied contracts and bid opportunities,

because Helder Flores was placed in the HPD Gang Tracker database.

379.   He was placed on in the database without his knowledge. He was not given notice by the city of Houston, or an opportunity to be heard in violation to his due process.

380.   His in a direct retaliation effort to prejudice the finder of fact as it relates to his alleged crime of Aggravated Assault of a Public Servant, and any future proceedings.

381.   He was not placed in the database until after this incident occurred, and without a basis for doing so. The Removal is necessary so that it does not prejudice him in this proceeding or any further proceedings.

382.   In addition, equitable relief, including, without limitation, that each defendant be made to apologize and City of Houston to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein; and such other relief, including injunctive and/or declaratory relief, as the court may deem proper.

383.   As a direct and proximate result of the current allegation made the base of the lawsuit plaintiff has incurred the following damages:

384.   Past and Future medical care and expenses, from each defendant jointly and severally.

385.  Past and Future physical pain and suffering, from each defendant jointly and severally.

386.  Past and Future Physical impairment, from each defendant jointly and severally.

387.  Direct damages from each defendant jointly and severally.

388.  Equitable relief, including, without limitation, that City of Houston-Police

389.  Department, Officers Mawhood, and Harris be made to apologize and City of Houston to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein; Such other relief, including injunctive and/or declaratory relief, as the court may deem proper.

390.  Attorney fees and costs under 42 U.S. C. 1983 and 1988 including reasonable and necessary, from each city defendant jointly and severally.

391.  Expert fees as prevailing party allowed under Federal Rule of Civil Procedure 54(d), 42 U.S.C. 1988, 28 U.S.C.  § 1920 and § 1821.

392.  Exemplary damages, Plaintiff's injury resulted from defendants, La Estancia Apartments, Harris, and Mawhood's gross negligence, which entitles plaintiff to exemplary damages under Texas Remedies Code section

41.003(a).

393.  Defendants acted with malice, gross negligence, defendants and agents acted with an extreme degree of risk of injury towards the plaintiff, despite the awareness of the risk and proceeded with deliberate indifference when, the defendant, Harris unjustifiably shot Plaintiff in the back, Past and Future loss income, wages, or earning capacity and other pecuniary losses.

394.  Damages for mental anguish, disfigurement, and other pecuniary losses.

In addition, Plaintiff seeks:

395.  Prejudgment Interest

396.   Court costs; and

397.  All other relief to which plaintiff is entitled.

398.  As a direct and proximate result of the current allegation Defendants' Negligence, Constitutional Violations, Wrongful Prosecution, Negligent Hiring, Training, Supervision, and Retention and Intentional Infliction of Emotional Distress caused injury to plaintiff.

## **PRAYER**

Plaintiff respectfully asks this Honorable Court   For these reasons, plaintiff asks that the court issue citation for defendant to respond, and that plaintiff be awarded a judgment against defendant for the following:

a. Actual damages.

c. Exemplary damages.

d. Prejudgment and postjudgment interest.

e. Court costs.

f. Attorney fees.

g. declaratory relief, and,

for all other relief to which he may be entitled.

Respectfully submitted

THE LEWIS LAW GROUP PLLC.

By: <u>U. A. Lewis</u>

U. A. Lewis
State Bar No. 24076511
Federal Bar No. 1645666
P. O. Box 27353
Houston, TX 77227
Telephone: (713)570-6555
Facsimile: (713) 581-1017
Email:myattorneyatlaw@gmail.com
LEAD COUNSEL FOR THE PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that on the date of this filing, November 9, 2018, a true and correct copy of the above and foregoing document was served on each attorney of record VIA ECF.

By: /s/U.A. Lewis

U.A. Lewis