**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| HELDER FLORES, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § CIVIL ACTION NO. H-17-3817 |
| | § |
| THOMAS L. HARRIS, ANTON M. | § |
| MAWHOOD, CITY OF HOUSTON, | § |
| LA ESTANCIA APARTMENTS, and | § |
| 2012 MULTI-FAMILY REAL ESTATE | § |
| FUND, LLC, | § |
| | § |
| Defendants. | § |

**MEMORANDUM AND ORDER**

On July 22, 2015, Houston Police Department Officer Thomas Harris shot Helder Flores at

La Estancia Apartments, where Harris was working an off-duty second job as a security guard.

Flores sued the City of Houston, Harris, and Anton Mawhood, another HPD officer at the scene that

night.[1]  (Docket Entry Nos. 1-1, 6, 78).  Flores alleges constitutional violations under 42 U.S.C.

§ 1983 and state-law causes of action for excessive force, racial discrimination, wrongful

prosecution, unlawful arrest, illegal search and seizure, negligence, failure to train, and violations

of the Texas Constitution.  (*See* Docket Entry No. 78).  The City, Harris, and Mawhood have moved

to dismiss Flores's Fourth Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

(Docket Entry No. 79).  The City and the officers have also separately moved for summary judgment

under Rule 56.  (Docket Entry Nos. 100, 102).  Flores has responded to the motions, (Docket Entry

---

[1] Flores also sued La Estancia Apartments and the 2012 Multi-Family Real Estate Fund, LLC. However, those parties have reached a settlement agreement, and the court has dismissed the action against them.  (*See* Docket Entry No. 126).

1

Nos. 112–15, 122, 123), and the City and officers have replied. (Docket Entry Nos. 119, 120).

Based on the amended complaint; the motions, responses, and replies; the record; and the applicable law, the court grants the City's motion for summary judgment, (Docket Entry No. 100), and denies in part and grants in part Harris's and Mawhood's motion for summary judgment, (Docket Entry No. 102). The court denies as moot the defendants' motion to dismiss. (Docket Entry No. 79).

The reasons are explained below.

## I. Background

### A. The Summary Judgment Evidence

The City's and the police officers' summary judgment evidence includes several exhibits filed under seal:

1.   the Houston Police Department Internal Affairs Division's investigative report for the July 2015 shooting, (Docket Entry No. 101-1, 103-1);

2.   the Houston Police Department's offense report for the July 2015 shooting, (Docket Entry No. 101-2, 103-2);

3.   Mawhood's administrative statements from September 2, 2015, and October 12, 2015, (Docket Entry Nos. 101-3, 101-4, 103-3, 103-4);

4.   Harris's administrative statements from September 2, 2015, and October 12, 2015, (Docket Entry Nos. 101-5, 101-6, 103-5, 103-6); and

5.   the Houston Police Department's Gang Database entry related to Flores, (Docket Entry No. 101-7, 103-7).

The City has also presented:

1.   Mawhood's and Harris's training records, (Docket Entry Nos. 100-8, 100-9, 102-8, 102-9);

2.   expert reports by a consulting forensic scientist, Edward Hueske, (Docket Entry No. 100-10, 102-10);

2

3. expert reports by a professor of criminology, Dr. Robert Taylor, (Docket Entry No. 100-11, 102-11); and

4. the Houston Police Department policies on the use of force and effecting arrests and searches, (Docket Entry Nos. 100-12, 100-13, 102-12, 102-13).

In response, Flores submitted:

1. his 2018 deposition, (Docket Entry No. 114-2, 115-1);

2. a 2018 affidavit by Daniel Negron Vargas, (Docket Entry No. 114-3, 115-2); a 2015 affidavit by Edward R. Cruz, (Docket Entry No. 114-4, 115-3);

3. an expert report by Dr. William H. Reading that evaluates Flores's mental health, (Docket Entry No. 114-5, 115-4);

4. Harris's 2018 deposition, (Docket Entry No. 114-6, 115-5);

5. Mawhood's 2018 deposition, (Docket Entry No. 114-7, 115-6);

6. Houston Police Department Lieutenant Bradley Morefield's 2018 deposition, (Docket Entry No. 114-8, 115-7);

7. Houston Police Department Sergeant Clint Ponder's 2018 deposition, (Docket Entry No. 114-8; 115-7);

8. the 2018 deposition of Jimmie Lea Conway, the vice-president for the Stone Legacy Group, (Docket Entry No. 114-9, 115-8);

9. the amended complaint in *Okhueleigbe v. Harris*, a 2012 civil case against Harris, (Docket Entry No. 114-10, 115-9);

10. Houston Police Department Internal Affairs investigative reports on incidents involving off-duty officers, (Docket Entry No. 114-11, 115-10);

11. the Houston Police Department extra-employment permit application for Guardian Equity Management, (Docket Entry No. 114-12, 115-12);

12. the Houston Police Department Internal Affairs Division's report on the July 22, 2015, shooting, (Docket Entry No. 115-11); and

13. an expert report by Keith A. Howse, (Docket Entry No. 114-13, 115-13).

Flores also filed his medical records related to the shooting under seal. (Docket Entry No. 117).

## B. The Shooting at La Estancia Apartments

On July 22, 2015, City of Houston Police Department Officers Thomas Harris and Anton Mawhood were working an off-duty job at La Estancia Apartments in Houston, Texas. The apartments required the officers to wear their uniforms and bring their own equipment. (Docket Entry No. 115-5 at 19, 55). The officers drove to La Estancia that evening in Mawhood's car and drove around patrolling the parking lot. (*Id.* at 31, 33).

Helder Flores was visiting La Estancia Apartments that same evening. (Docket Entry No. 103-1 at 6). As he was leaving the apartment building, Flores came across Daniel Vargas and Eduardo Cruz and began walking with them through the parking lot toward the exit to the street. (*See* Docket Entry No. 114-2 at 7, 12). As the three men walked through the building's parking lot, Flores noticed a passing car that he suspected contained MS13 gang members. (*Id.* at 8, 12–13; Docket Entry No. 101-1 at 5). According to Flores's account, he started walking faster through the parking lot and crouched beside a vehicle to better observe the car. (Docket Entry No. 103-1 at 9; Docket Entry No. 114-2 at 9). Flores was carrying a gun in his waistband. Flores asserts that as he picked up his pace, he felt the gun slip down, but that he did not grab or adjust the gun. ((Docket Entry No. 114-2 at 10; Docket Entry No. 103-1 at 9–10; *see* Docket Entry No. 101-1 at 5–7). Flores stood back up and resumed walking toward the corner of the parking lot when he heard a gunshot and fell to the ground. (Docket Entry No. 114-2 at 7). Flores testified that he did not see officers behind him, hear anyone identify himself as a police officer, or hear any order or warning before he heard the shots. (Docket Entry No. 101-1 at 5–6). Cruz testified that he heard someone shout "aye" before the gunshots. (Docket Entry No. 101-1 at 12–13).

Officer Harris fired his gun three times, hitting Flores in the upper back. Flores was lying bleeding on the pavement when Mawhood and Harris approached after the shots were fired.

(Docket Entry No. 115-6 at 78). Flores asserts that the police officers were not wearing uniforms. (*See* Docket Entry No. 115-2 at 50; Docket Entry No. 102 at 5, 26)

According to Officer Harris's version of events, as he and Officer Mawhood were driving around the parking lot, they spotted three men walking through the lot. The officers believed that the men "were acting very suspicious" because they "were looking around" and appeared to be in "some kind of altercation among themselves." (Docket Entry No. 115-5 at 31). After observing Flores, Vargas, and Cruz make their way toward the parking-lot exit gate, Officer Harris saw Flores pause between a car and the gate, "reaching into his pants." (*Id.*). Harris testified that he saw Flores pull something from his pants, but Harris could not make out what it was until Flores stood up. At that point, Harris saw that Flores was holding a gun behind his leg. (*Id.* at 32, 37, 56). According to Harris, Flores "start[ed] running off to the side," holding the gun in front of him and pointing it at the street as if aiming at another person. (*Id.* at 32).

Harris testified that Mawhood stopped the car, and Harris stepped out, yelling at Flores that he was a police officer and ordering Flores to drop the gun. (*Id.* at 32, 37, 57; *see also id.* at 58; Docket Entry No. 115-6 at 65). Harris's version of events is that Flores, while running away from Harris and toward the exit, turned his torso toward Harris and pointed the gun at him. (*Id.* at 32–33).

Mawhood testified that when Harris got out of the car, he promptly identified himself as a police officer and yelled commands at Flores and the other two men with him. Mawhood testified that he saw Flores with a gun in his right hand, turn his upper body around, and point his gun at Harris. (Docket Entry No. 101-1 at 16, 18; Docket Entry No. 115-6 at 37–38, 40–41, 65–67). Harris then fired his gun from behind the open car door, striking Flores in the back. (Docket Entry No. 114-5 at 33). (*See* Docket Entry No. 155–6 at 33, 68–69). The officers maintain that they were wearing their uniforms that evening. (Docket Entry No. 115-5 at 57, 58; Docket Entry No. 115-6

at 33, 68–69).

The officers lost sight of Flores when he fell after the shooting. Harris and Mawhood approached the spot where Flores, Vargas, and Cruz had been standing when the shooting started. (*See* Docket Entry No. 115-5 at 43). Flores was lying beside a truck, with Vargas standing nearby. (Docket Entry No. 115-6 at 65). The parties and witnesses have different accounts about whether Cruz hid under a car in the parking lot or fled the scene on foot to avoid the police. (Docket Entry No. 115-5 at 43; Docket Entry No. 115-6 at 25, 26).

The officers both testified that it was when they saw Flores that he had been shot and that a gun was on the ground within his reach. (Docket Entry No. 115-6 at 65). The officers continued toward the Flores and Vargas with their own guns drawn and ordered Flores and Vargas to show their hands. Mawhood handcuffed Flores while Harris handcuffed Vargas. (Docket Entry No. 115-6 at 78). Harris radioed dispatch to request an ambulance at 6:49 p.m. (*See* Docket Entry No. 101-1 at 28; Docket Entry No. 115-6 at 78). Flores testified that he began to lose consciousness after he was shot and was not aware of the officers or who shot him. (Docket Entry No. 115-1 at 10).

When on-duty Houston Police Officers Rodriguez and Mathis arrived, they found Flores handcuffed and lying on the ground, bleeding but conscious. (Docket Entry No. 101-2 at 6). Officer Rodriguez's filed report states that a .38 caliber revolver was on the ground next to Flores's foot, which was then taken as evidence. (*Id.* at 6, 14). Rodriguez interviewed Vargas at the scene. The Houston Police Department offense report states that Rodriguez learned that Vargas and Flores were both members "of the street gang the 'Southwest Cholos.'" (*Id.* at 6). At 7:04 p.m., emergency medical services took Flores to the hospital, where he had surgery. (*Id.* at 17–18; *see* Docket Entry No. 101-1 at 28).

On August 10, 2015, after an 8-week stay, the hospital discharged Flores. He was booked

into the Houston Central Jail on a charge of aggravated assault on a peace officer. (Docket Entry No. 101-1 at 29). The next day, Flores was transferred to the Harris County Jail, and he was formally charged with aggravated assault against a public officer. (*Id.*). He was released on September 10. (*Id.*; Docket Entry No. 78 at ¶ 134). The Harris County District Attorney later reduced the charge in exchange for Flores pleading guilty to a misdemeanor offense of unlawfully possessing a firearm. (Docket Entry No. 78 at ¶ 168).

###     C.     The Houston Police Department's Gang Database

The Houston Police Department maintains a Gang Tracker Database that documents suspected gang members in Houston. (*See* Docket Entry No. 114-8 at 69–70). When an officer encounters—whether in a traffic stop, during an investigation, or in conversation—an individual who the officer believes is a gang member, the officer may enter that individual into the Database if the officer determines that the individual meets at least two out of eight criteria provided under an earlier version of the Texas Code of Criminal Procedure. (*Id.* at 70). The eight criteria are: self-admission; corroborating identification by a reliable person; corroborating identification by an unreliable person; visible gang symbols, such as gang colors and tattoos; frequent presence in known gang areas; arrest for a known gang crime with other gang members; visiting a known gang member other than a family member in a penal institution; and using social media to recruit for a gang. (*Id.*). "Reliable persons" include school officials, apartment managers, store clerks, and police officers; "unreliable persons" include gang members, codefendants, and cosuspects. (*Id.*).

Officers have access to the Database from Houston Police Department computers and patrol cars. (*Id.* at 72). Individuals entered into the Database are not informed that they are listed as a gang member. (*Id.*). Officers use the Database in investigations, including searching for "addresses, nicknames, vehicles associated with the [relevant] gang member," and other biographical

information about potential suspects. (*Id.* at 73). Entries for adults in the Database expire after five years, and entries for juveniles expire after two years. The commission of new gang-related crimes resets the expiration clock. (*Id.* at 73).

The Houston Police Department does not require specific training on the Gang Database. (*Id.* at 74). When an officer submits an entry to the Database, the entry goes to the Department's Gang Division. (*Id.*). The Gang Division reviews the entry to determine if it meets at least two of the state-law criteria; if it does not, the submitting officer must make corrections or the Gang Division will reject the entry. (*Id.* at 74–75). If an individual meets the criteria and is listed in the Database, that fact appears on criminal-history background checks, including checks that private companies run on job applicants. (*Id.* at 77).

Flores alleges that he was entered into the Houston Police Department's Gang Database in 2015 because he is Hispanic. (Docket Entry No. 78 at ¶ 326). The Database's entry on Flores includes information on his race, appearance, social security and driver's license numbers, and gang affiliation. (Docket Entry No. 101-7 at 3). The first event included in the entry is that Flores was stopped and observed with known Southwest Cholos gang members on March 14, 2015, after a call that gang members were creating a disturbance at an apartment complex. (*Id.* at 6). A second event is dated as entered on October 19, 2017, and it states that an officer found Flores "associating with three other documented gang members" of the Southwest Cholos gang. (*Id.*). The entry includes two other criteria for entering Flores in the Gang Database as a Southwest Cholos member: (1) Flores made "[a] self-admission . . . of criminal gang membership"; and (2) he "frequents a documented area of a criminal street gang and associates with known criminal street gang members." (*Id.* at 7). The entry includes several photographs of Flores, dated October 2017, including images showing his tattoos, which are also identified as signifying gang membership. (*Id.*

at 4). Flores denies that he is a member of the Southwest Cholos and argues that he was included in the Database solely because of "his race, color or ethnicity." (Docket Entry No. 102 at 35).

### D. Flores's Claims

Flores asserts claims against the City of Houston and Officers Harris and Mawhood for the 2015 shooting and for his inclusion in the Gang Database. His fourth amended complaint includes the following:

1. negligence claims against Harris, (*id*. at ¶¶ 316–17);

2. claims under the Texas Constitution, Article I, Section 19 for deprivation of life or liberty without due process, against the City, Harris, and Mawhood, (*id*. at ¶ 318);

3. section 1983 claims against the City, Harris, and Mawhood for wrongful arrest, (*id.* at ¶¶ 319–20);

4. section 1983 claims against Harris and the City for excessive force, (*id*. at ¶¶ 321–23);

5. section 1983 claims against the City, Harris, and Mawhood for violating Flores's right to equal protection on the basis of race, (*id*. at ¶¶ 325–27);

6. section 1983 claims against the City, Harris, and Mawhood for failing to provide, or delaying in providing, medical care, (*id*. at ¶¶ 328–31); and

7. section 1983 claims against the City for unconstitutional customs, policies, and practices that encourage the "use of excessive deadly force; unlawful detentions; failures to intervene; the delay of medical care . . . and race based policing, (*id*. at ¶ 334; *id.* at ¶¶ 332–37).

The fourth amended complaint also includes a section alleging generally that the City, Mawhood, and Houston violated Flores's rights under the Fourth and Fourteenth Amendments and asserting claims under 42 U.S.C. §§ 1983, 1985, and 1988 and Texas law. Flores argues that the defendants

violated his right to be "free from cruel and unusual punishment." (*Id.* at ¶ 269).[2]

## II. The Legal Standard

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316,

---

[2] Flores's fourth amended complaint also states that he alleges intentional infliction of emotional distress and wrongful prosecution, (Docket Entry No. 78 at ¶ 398), but in his reply to the officers' motion for summary judgment, Flores asserts that he has not brought either claim, (Docket Entry No. 112 at 40; Docket Entry No. 113 at 40). The court does not analyze these causes of action and assumes that Flores has abandoned these claims.

326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## III.  The Evidentiary Objections

Under Federal Rule of Civil Procedure 56, the facts set out to support or oppose a motion for summary judgment must be admissible into evidence. FED. R. CIV. P. 56(c)(4). "In the Fifth Circuit, it is well settled that 'the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to trial.'" *Lohan v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 823 (S.D. Tex. 2009) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004)). The parties must present evidence that is "capable of being 'presented in a form that would be admissible into evidence.'" *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) (quoting

*LSR Consulting, LLC v. Wells Fargo Bank N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)). The court cannot consider unauthenticated documents or hearsay. *Johnson v. Spohn*, 334 F. App'x 673, 677–78 (5th Cir. 2009); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987). The court will also not consider legal conclusions or statements that are not based on personal knowledge. *See* FED. R. EVID. 602, 701, 702.

"A district court may rely on affidavits in the summary judgment context where the affiants' 'personal knowledge and reasonable competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore.'" *Lohan*, 652 F. Supp. 2d at 823–24 (citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005)); *see also* FED. R. CIV. P. 56(e). The Fifth Circuit "does not require conclusive proof of authenticity before allowing the admission of disputed evidence . . . . It merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.'" *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (quoting *United States v. Arce*, 997 F.2d 1123, 1228 (5th Cir. 1993)); *see also* FED. R. EVID. 901(a).

### A.    Flores's Spoliation Claim

Flores's response to the officers' summary judgment motion argues that the City failed to preserve video-surveillance camera footage of the 2015 shooting. (Docket Entry No. 112 at 16–17). He argues that the City did not look for the footage until days after the shooting and now "claims the owner changed and the recording equipment was taken," so the recording no longer exists. (*Id.*). Flores cites to a photograph of the surveillance camera in the La Estancia parking lot, but he did not include the photograph in his summary judgment evidence. (*Id.*). Flores does not explain the relief he seeks for this alleged spoliation. The officers argue that they "did not have care, custody or

control of the apartment complex's video equipment" and ask the court to disregard Flores's allegation. (Docket Entry No. 120 at 4).

"A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010)). Spoliation is "the destruction of evidence . . . . or the significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998) (internal quotation marks omitted). A court may impose sanctions if a party with a duty to preserve evidence fails to do so and acts with culpability. FED. R. CIV. P. 37(c)(1). A sanction may include an instruction that if a party that destroys or loses evidence subject to a preservation obligation, the fact finder may presume that the evidence was prejudicial. *See FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir. 1982)). In the Fifth Circuit, a severe sanction for spoliation, including an adverse-inference instruction, requires showing bad faith. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citing *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000)).

The record does not provide a basis for concluding that the City breached a duty to preserve evidence or otherwise acted in bad faith. Flores does not point to evidence in the record supporting an inference that the City knew that a video recording of the shooting would be destroyed or lost shortly after the shooting. Without evidence that the City acted in bad faith to make the recording unavailable, this court cannot draw an inference of spoliation or impose sanctions Flores seeks. *See Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952–53 (5th Cir. 2001).

### B.     The Officers' Objections to Flores's Summary Judgment Evidence

#### 1.     The Objections to Flores's Statement of Issues and Introduction

The officers object to both the introduction and statement of the issues in Flores's response to their summary judgment motion.  (Docket Entry No. 120 at 3).  They argue that the introduction relies on hearsay to discuss an earlier incident alleging excessive force against Harris.  According to the officers, the earlier incident is being used as inadmissible character evidence, is irrelevant to Flores's shooting and arrest, and would be highly prejudicial if considered.  (*Id.*).  The officers also argue that Flores's statement of issues is "misleadingly framed with contested facts."  (*Id.*).  The officers ask the court to strike the introduction and disregard Flores's statement of the issues.  (*Id.*).

While the officers are correct that Flores's introduction includes a paragraph on a prior alleged excessive-force incident, their argument for striking the introduction does not explain why considering it would be unfairly prejudicial.  The court evaluates the officers' more specific objections to Flores's evidence of that alleged incident below.  Flores's statement of the issues clearly includes several legal conclusions and assertions of contested facts.  To this extent, the court disregards the statement of the issues and evaluates the officers' more specific objections to Flores's evidence of that alleged incident below.

#### 2.     The Objection to Flores's Reference to Prior Deadly Force Encounters

In his response to the officers' summary judgment motion, Flores asserts that the Houston Police Department's Internal Affairs Division previously investigated Anton Mawhood after an in-custody death of an arrestee that was "ultimately determined to be a suicide."  (Docket Entry No. 112 at 14).  The officers argue that the reference to the prior death and investigation is hearsay, irrelevant to liability in this case, and inadmissible character evidence that is highly prejudicial.  (Docket Entry No. 120 at 3).  They ask the court to disregard Flores's references to the prior death.

(*Id.*).

The officers are correct that Flores attempts to use inadmissible character evidence that is irrelevant to determining whether Mawhood or Harris is liable for the constitutional violations that Flores alleges. Federal Rule of Evidence 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . The evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

FED. R. EVID. 404(b)(1)–(2). Extrinsic evidence must satisfy two criteria for admission under Rule 404(b): (1) it must be relevant under Federal Rule of Evidence 401 to an issue other than the defendant's character; and (2) it must have probative value that substantially outweighs its prejudicial impact under Federal Rule of Evidence 403. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

Rule 401 defines relevant evidence as evidence that tends to make a fact that is of consequence in determining the action more probable or less probable than it otherwise would be. FED. R. EVID. 401. Flores refers to this investigation to support an inference that Mawhood's conduct on July 22, 2015, was in conformity with conduct that resulted in this prior death and, in turn, support an inference that Mawhood had a propensity to use excessive force. Flores has offered no explanation of how the prior investigation might show admissible proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." (*See* Docket Entry No. 120 at 14). Flores appears to offer this evidence for precisely the purpose that the Federal Rules of Evidence prohibit. It is also unclear that the evidence is relevant, because Flores has not alleged that Mawhood used excessive force against him, and he does not explain how the prior investigation relates to whether Mawhood unlawfully arrested him or failed to provide emergency

medical care, in violation of Flores's constitutional rights. The court disregards the references to, or evidence of, this prior death and investigation in its analysis.

### 3. The Objection to References to a Driving While Intoxicated Incident and the Prior Death and Lawsuit

Flores refers to, and includes in his summary judgment evidence, information on a prior driving-while-intoxicated (DWI) incident involving Harris and a 2012 civil case against Harris for the death of a suspect in Harris's custody. (Docket Entry No. 112 at 2, 10, 13–14; Docket Entry No. 114-10). The officers argue that Flores is seeking to introduce inadmissible and highly prejudicial character evidence through the evidence of the DWI incident and the prior death and lawsuit, and ask the court to disregard it. (Docket Entry No. 120 at 3–4). They ask the court to strike both the exhibit and the references to the prior death and resulting litigation. (*Id.*).

A party introducing Rule 404(b) evidence must show a proper purpose, that the evidence is relevant, that the evidence's potential for unfair prejudice does not outweigh its probative value, and must articulate the purpose of that evidence. FED. R. EVID. 404. Flores has not made this showing. Flores's primary claim against Harris is for excessive force. Neither the DWI nor the prior lawsuit appears relevant to "whether [Harris's] actions [were] 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The DWI and evidence of the prior death and lawsuit instead appear to be offered as evidence of Harris's propensity for excessive force. The officers' request to disregard the DWI and the prior death and litigation suit is granted. The evidence will not be considered. FED. R. EVID. 404(a).

### 4. The Objection to Flores's Medical Records

The officers argue that Flores's medical records are unauthenticated and ask the court to

strike them. (Docket Entry No. 120 at 4; *see* Docket Entry No. 117). Federal Rule of Evidence 901 requires those records to be authenticated for admission into evidence. *See Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 270 n.10 (5th Cir. 2002) (unauthenticated medical records are insufficient to raise a genuine factual dispute on summary judgment). "For purposes of authentication, Federal Rule of Evidence 901(a) requires 'evidence sufficient to support a finding that the item is what the proponent claims it is.'" *Mims v. Oliver*, No. H-15-644, 2017 WL 3034032, at *5 (S.D. Tex. July 18, 2017). "Circumstantial evidence, such as the document itself and the circumstances surrounding its discovery, is sufficient for authentication." *Id.* (citing *In re McLain*, 516 F.3d at 308). The Fifth Circuit requires only "some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." *In re McLain*, 516 F.3d at 308 (quoting *Arce*, 997 F.2d at 1128)..

An authentication objection is a proper basis for excluding this evidence. Flores has not provided an affidavit authenticating the records or pointed to circumstantial evidence in the document or other discovery that could authenticate it. *See, e.g.*, *Luna v. Macy's South, Inc.*, No. H-17-1759, 2018 WL 3609053, at *3 (attorney's affidavit and certificate of service from discovery were sufficient to authenticate medical records). The court strikes the medical records from the summary judgment evidence, but notes that authentication is not a demanding requirement. Flores may supplement to authenticate the records. (Docket Entry No. 117). There is no basis to believe that the analysis or outcome would be affected.

### 5. The Objection to the Investigative Report Exhibit L

The officers argue that Flores's Exhibit L, which includes investigative reports by the Houston Police Department, is irrelevant to whether the City, or either officer, is liable and is hearsay. (Docket Entry No. 120 at 4; *see* Docket Entry No. 114-11; Docket Entry No. 115-10).

They also argue that Flores breached a protective order because the reports were not filed under seal. (*Id.*). The officers ask the court to strike the exhibit. (*Id.*).

Hearsay statements are admissible if they meet one of the exceptions under the Federal Rules of Evidence. FED. R. EVID. 802. Federal Rule of Evidence 803(8) excludes from the hearsay rule evidence certain public records, and it contemplates the admissibility of "factual findings from a legally authorized investigation." FED. R. EVID. 803(8)(A)(iii). A public record is not excluded by the hearsay rule if it is a record, report, statement, or data compilation setting forth "(i) the office's activities; (ii) a matter observed while under a legal duty to report . . . (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and . . . . the opponent does show that the source of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803(8). When reports contain witness statements that are offered to prove their truth, the statements are typically inadmissible. *Cf. United States v. Dotson*, 821 F.2d 1034, 1036 (5th Cir. 1987). The Rules of Evidence allow an exception for evidence that has other circumstantial guarantees of trustworthiness, permitting its admission under the residual hearsay exception. *See* FED. R. EVID. 807. It is likely that the reports and their contents could fit into the public record or residual exception because they are reports created as part of the Houston Police Department's legal duties.

Regardless of whether the reports are or contain hearsay or are admissible under a hearsay exception, there is another reason to strike the exhibit: the parties agreed to a protective order that requires the parties to file under seal "[a]ll internal Houston Police Department files, including but not limited to internal affairs division files, and/or other investigatory files" when such documents are "filed in conjunction with a pre-trial motion or other matter." (Docket Entry No. 11 at 1, 2). A party's violation of the protective order precludes that party "from using the document(s) or item(s)

that were the subject of the violation in any matter, hearing, or trial in this lawsuit." (*Id.* at 2).

Flores did not file Exhibit L under seal, violating the protective order, and did not explain why or take corrective action. (*See* Docket Entry No. 114-11; 115-10). The court strikes the exhibit and disregards it in its analysis of the pending motions. Again, if Flores corrects this filing, withdrawing it from the public court records and filing it under seal, it can be considered. There is no basis to believe that the analysis or outcome would change.

### 6. The Objection to Exhibit M

The officers argue that Exhibit M, although referred to in Flores's response as being a "Public Records" document, is not included in Flores's filed summary judgment evidence. (Docket Entry No. 120 at 4). The officers also argue that the exhibit is irrelevant to the question of the officers' liability and is hearsay. (*Id.*). They request that the court strike the exhibit. (*Id.*).

The officers are correct that Flores, although he cited Exhibit M in his response to the summary judgment motion, did not file the exhibit as summary judgment evidence. (*See* Docket Entry No. 112 at 4, 9). It appears that Exhibit M was meant to include documents showing that the Harris County District Clerk served La Estancia Apartments with Flores's state-court petition; no other citations to Exhibit M appear in Flores's argument. (*See id.* at 8). The court disregards the parts of Flores's argument that rely on Exhibit M, but again if he corrects the record, that may make it proper to consider Exhibit M.

### 7. The Objection to Exhibit O, Harris Admission

The officers argue that Exhibit O, although referred to in Flores's response, is not included in Flores's summary judgment evidence. (Docket Entry No. 120 at 5). They ask the court to strike the exhibit. (*Id.*). The officers are correct that Flores, although referencing Exhibit O in his response as "Harris Admission," has failed to file a corresponding exhibit with his summary

judgment evidence. (*See* Docket Entry No. 112 at 4). While Flores's response refers to Exhibit O only in the list of summary judgment evidence and it is unclear what Exhibit O would have included, the court disregards those portions of Flores's argument that rely on Exhibit O. Corrective action may change this for future consideration, but here there is no basis to conclude that the summary judgment analysis or outcome would change.

### 8. The Objection to Howse's Expert Report

Flores offers as summary judgment evidence an expert report from Keith A. Howse. (Docket Entry No. 114-13). According to Howse's curriculum vitae, he is an attorney licensed in Texas who has worked as a consultant and investigator on matters related to security and police practices since 2000. He spent ten years as the Director of Public Safety of the Baylor Health Care System Department of Public Safety, served as a police officer for fifteen years in various capacities before 1997, and has studied political science, criminal justice, criminology, and law. He served as an expert witness in eight cases in the last four years. (*Id.* at 15–23). Howse offers his "preliminary evaluation of the conduct of Officer Thomas Harris, Officer Anton Mawhood and the City of Houston Police Department," including "whether their interaction with Mr. Helder Flores was reasonable and whether their actions, training, or policies/procedures were consistent with professional standards and practices of the law enforcement profession." (*Id.* at 3). The officers argue that Howse's report contains hearsay and conclusory opinions, but they do not specify the parts of the report they object to. They ask the court to strike the entire report. (Docket Entry No. 120 at 5).

Federal Rule of Evidence Rule 702 governs the admissibility of expert testimony. *See Simpson v. James*, 903 F.2d 372, 378 n.20 (5th Cir. 1990); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 292 (5th Cir. 1975). Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Under Rule 702, the court must determine whether the proposed expert witness has training or experience, and will offer opinions, sufficiently related to the issues and evidence before the court for the expert's testimony to assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562–63 (5th Cir. 2004). The district court must also make a "preliminary assessment of whether that reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)). The court "must ensure the expert uses reliable methods to reach his opinions." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Howse stated that in preparing his report, he reviewed the Houston Police Department's internal affairs investigation report, interview of Vargas, and statement from Cruz; Flores's medical records; the additional incident reports included in Flores's summary judgment evidence; Flores's third amended complaint; the Texas Penal Code; Mawhood's and Harris's depositions; two *Houston Chronicle* articles on Harris's prior involvement in the death of a suspect; an expert report for a 2012 case in the U.S. District Court for the Southern District of Texas; the transcript of Andrew J. Scott's testimony; a *Houston Chronicle* investigative series on police shootings; and a *Texas Observer* 2018 interview with Houston Police Department Chief Art Acevedo. (Docket Entry No. 114-13 at 1–2).

Howse concluded, based on his review of these documents and his experience, that

"additional discovery is needed in this matter to gather sufficient facts and testimony to address the sharply conflicting statements of the victim and witnesses as compared to" those of Mawhood and Harris, and to determine whether the Department used the "proper standard of review" in its investigation. (*Id.* at 13–14). Howse opined that while there may be some support for Harris's argument that he had an objectively reasonable bases for detaining Flores, that "does not justify the use of force and therefore, any use of deadly force would be an excessive use of force." (*Id.* at 6; *see also id.* at 7). Howse also opined that "[a]dditional discovery will be necessary to obtain additional facts surrounding Officer Mawhood's decision not to use deadly force." (*Id.*).

Although expert testimony is not objectionable simply "because it embraces an ultimate issue," an expert's opinion on ultimate issues can be excluded if it is otherwise inadmissible under the Federal Rules of Evidence. FED. R. EVID. 704. When opinion testimony combines law and fact, the question is "whether the opinion will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" 29 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 6284 (2d ed.) (quoting FED. R. EVID. 702). Expert opinions as to whether a defendant violated the law are inadmissible. FED. R. EVID. 702; *see Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009). Whether Harris's use of deadly force was excessive, and whether Mawhood is liable for failing to prevent it, are a legal questions that are not proper subject matter for expert testimony.

To the extent that Howse offers legal conclusions, the court does not consider his expert report. Howse's opinions on whether the officers' conduct conformed to professional standards of care is relevant to determining whether the force Harris used was excessive, but these opinions do not show whether a reasonable officer in the same circumstances would have believed that his or

her conduct was reasonable.  *See, e.g.*, *City & Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1777 (2015) ("[S]o long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoi[d] summary judgment by simply producing an expert's report than an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless" (alteration and internal quotation marks omitted) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

The officers have not identified what parts of Howse's report they object to as hearsay.  The Fifth Circuit has explained the rule on an expert's use of hearsay information:

> Expert witness testimony is a widely-recognized exception to the rule against hearsay testimony. It has long been the rule of evidence in the federal courts that an expert witness can express an opinion . . . even though his opinion is based in part or solely upon hearsay sources. The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion. Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

*LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 435 n.5 (5th Cir. 1982) (citations omitted) (quoting *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971), *cert. denied*, 405 U.S. 954 (1972)). Because the officers have not explained the basis for their hearsay objection and because Howse is permitted to rely on hearsay sources, the court does not strike the report on that ground.

## IV.   Flores's Cruel and Unusual Punishment Claim

Flores asserts a claim that, under the Fourth and Fourteenth Amendments to the U.S. Constitution, the Defendants violated his right to be "free from cruel and unusual punishment."

(Docket Entry No. 78 at ¶ 269). The Defendants argue that the Eighth Amendment, not the Fourth or Fourteenth Amendments, prohibits cruel and unusual punishment. (Docket Entry No. 79 at 5). They explain that because the Eighth Amendment protects only convicted inmates, Flores cannot state a claim for cruel and unusual punishment. (*Id.*).

The Defendants are correct that Flores misstates the constitutional amendment applicable to his claims. *Compare Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985) (a claim of excessive force to effect an arrest is analyzed under the Fourth Amendment), *with Whitley v. Albers*, 475 U.S. 312, 318–26 (1986) (a claim of excessive force used to subdue a prisoner is analyzed under the Eighth Amendment). The City's and officers' motions for summary judgment on this claim are granted.

## V. The Section 1983 Claims Against Mawhood and Harris

Flores brings several constitutional claims under 42 U.S.C. § 1983 against Mawhood and Harris. He alleges that the officers' actions were an "illegal search and seizure" and that he was "wrongfully accused and incarcerated." (Docket Entry No. 78 at ¶ 319). He alleges that Harris used excessive force, violating Flores's Fourth Amendment rights. (*Id.* at ¶¶ 321–24). He also alleges that Mawhood and Harris "violated [his] constitutional rights by subjecting him to unlawful, unequal treatment on the basis of race." (*Id.* at ¶ 325). He alleges that Mawhood and Harris's "failure to render any medical care" after the shooting before EMS personnel arrived, and the delay in calling for EMS, also violated his Fourth and Fourteenth Amendment rights. (*Id.* at ¶ 328–31).

Mawhood and Harris argue that they are entitled to qualified immunity on all the claims Flores asserts against them. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). Qualified immunity "is an affirmative defense; once properly raised by the defendant, the 'plaintiff has the burden to negate the assertion of qualified immunity.'" *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks omitted); *see also Mullenix*, *v. Luna*, 136 S. Ct. 305, 308 (2015).

When a defendant invokes qualified immunity, the plaintiff must demonstrate that the defense does not apply. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). A court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). "[C]onclusory allegations and unsubstantiated assertions" cannot overcome the defense. *Miller v. Graham*, 447 F. App'x. 549, 551 (5th Cir. 2011).

"A plaintiff can overcome a qualified immunity defense by showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). Courts have discretion to decide which of the two elements to address first. *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the

law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (emphasis and alteration in original) (quoting *al–Kidd*, 563 U.S. at 741). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). The court "must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72 (quoting *al–Kidd*, 563 at 742). A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al–Kidd*, 563 U.S. at 741).

The plaintiff must also show that the defendant's conduct was objectively unreasonable. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008). "An official's actions are "objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution." *Id.* at 419.

## A. Excessive Force

Flores alleges that shooting him in the back was excessive force that "[a] reasonable officer would have known . . . violate[d Flores's] constitutional right to be free from unreasonable seizure" and that was "not objectively reasonable because . . . [Flores] did not pose a significant or immediate threat of death or serious physical injury to [Harris] or others." (Docket Entry No. 78 at ¶¶ 323, 325). Harris argues that he is entitled to qualified immunity on Flores's excessive force claim and moves to dismiss or for summary judgment. (Docket Entry No. 79 at 4–5; Docket Entry No. 102 at 17). According to Harris, shooting Flores was objectively reasonable under the totality of the

circumstances. (Docket Entry No. 102 at 17). Harris also argues that Flores's guilty plea for unlawfully carrying a weapon bars his excessive-force claim. (Docket Entry No. 120 at 7 (citing *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000))). Because both sides have submitted evidence, the motion to dismiss is moot and the court applies the standard for summary judgment.

The law at the time was clearly established that a suspect has the right to be free from excessive force. *Hill v. Carroll Cty.*, 587 F.3d 230, 234 (5th Cir. 2009). In February 2015, when Harris shot Flores, the law clearly established that "deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[3] *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 488 (5th Cir. 2001) (emphasis omitted) (quoting *Garner*, 471 U.S. at 11). The threat must be immediate. *Garner*, 471 U.S. at 11. The parties agree Flores that the court should analyze Flores's excessive-force claim under the Fourth Amendment's objective reasonableness standard. (*See* Docket Entry No. 98 at 11–12).

The elements of a claim for unconstitutionally excessive force are: "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)); *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013). Excessive-force determinations do not involve

---

[3] The court rejects the officers' argument that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Flores's claim because Flores was convicted of illegal possession of a firearm. (*See* Docket Entry No. 120 at 7). In *Heck*, the Supreme Court held that a court must dismiss a civil-rights action that would necessarily imply the invalidity of the plaintiffs' conviction or sentence unless the plaintiff shows that the conviction or sentence was reversed, expunged, declared invalid, or called into question. *Heck*, 512 U.S. at 486–87. Flores's § 1983 excessive-force claim would not require him to challenge or call into question his conviction and sentence for illegally possessing a weapon.

"easy-to-apply legal test[s]." *Scott v. Harris*, 550 U.S. 372, 383–84 (2007) (rejecting a bright line

between lethal and nonlethal force). The Supreme Court has described the inquiry as a "slosh . . .

through the factbound morass of 'reasonableness.'" *Id.* at 383.

Several principles guide a court's fact-specific inquiry. A court may not second-guess an

officer's conduct using hindsight, but instead must consider only the information available to the

officers at the time. *Hill*, 587 F.3d at 234 (citing *Graham*, 490 U.S. at 396–97). A court must

recognize that officers often make split-second decisions under stress. *Id.* "The court should

consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

arrest by flight.'" *Hogan*, 722 F.3d at 734 (quoting *Graham*, 490 U.S. at 396).

Flores's claim depends on showing that the force used "was clearly excessive to the need"

and that excessiveness was "objectively unreasonable." *Goodson*, 202 F.3d at 740. "It is

objectively unreasonable to use deadly force 'unless it is necessary to prevent [a suspect's] escape

and the officer has probable cause to believe that the suspect poses a significant threat of death or

serious physical injury to the officer or others.'" *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th

Cir. 2004) (alteration in original) (quoting *Garner*, 471 U.S. at 3).

The Fifth Circuit has held "an officer's use of deadly force to be reasonable when a suspect

moves out of the officer's line of sight such that the officer could reasonably believe that the suspect

was reaching for a weapon" after the officer announced himself to the suspect and the suspect

ignored the officer's commands. *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009). The Fifth

Circuit has also stated that whether the suspect was actually armed is irrelevant to whether the

officer's actions were reasonable because "the 'reasonableness' inquiry in an excessive force case

28

is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991) (quoting *Graham*, 490 U.S. at 397).

A court will find the use of deadly force "presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). An officer has an objectively reasonable basis to believe that a serious threat exists if "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened inflict of serious physical harm." *Garner*, 471 U.S. at 11. An officer may also use deadly force "if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 12. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Courts must judge the reasonableness of an officer's conduct by taking into account the 'tense, uncertain, and rapidly evolving' circumstances in which officers must often 'make split-second judgments . . . about the amount of force that is necessary in a particular situation.'" *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (internal quotations omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Whether Harris's conduct was objectively reasonable turns on whether he had probable cause to believe that Flores posed a significant threat of death or serious physical injury to Harris or others. *See Flores*, 381 F.3d at 399. Based on Mawhood's and Harris's September 2 and October 12, 2015,

administrative statements, (Docket Entry Nos. 103-3, 103-4, 103-5, 103-6), Harris argues that his actions "were justified, objectively reasonable, and were in compliance with the law and Houston Police Department procedures and policies." (Docket Entry No. 102 at 18).

According to these statements, Flores posed an "imminent and deadly threat" that justified the shooting. (*Id.* at 19). The officers stated that: they were wearing their HPD uniforms at the time; Harris saw Flores "holding a gun in a low ready position as if he were preparing to fire at a target"; Harris identified himself as a police officer and ordered Flores to drop the gun; and Flores pointed his gun at Harris, all before Harris shot Flores. (*Id.* at 18). Harris testified in his September 2, 2015, administrative statement for the HPD investigation that after seeing Flores and the two other men walking toward the parking lot exit gate, he saw Flores crouch by a car, "pull something from the area of his waistband with his hands," stand up, and begin to jog toward the gate while "holding a pistol in his right hand." (Docket Entry No. 103-5 at 3). Harris testified that after he saw Flores put the gun into a "low ready position," he got out of Mawhood's car and drew his service weapon. (Docket Entry No. 103-5 at 4). Harris and Mawhood both testified in their depositions and administrative statements that Flores "raised his gun up and pointed it at Officer Harris," before Harris fired his weapon. (Docket Entry No. 103-4 at 3).

Flores's version of the events differs. Flores testified that while walking through the parking lot, he saw a car approaching with people he believed to be MS-13 gang members. (*See* Docket Entry No. 112 at 2). He walked faster and tried to hide between parked cars. Although he never saw the officers, Flores testified that "Harris jumped out [of] a private unmarked car, with only jeans and tee shirt on." (*Id.*). Harris then shot at Flores, hitting him in the back. (*Id.*). Flores argues that, although he had a gun in his waistband, he was not holding it in his right hand, as Harris has stated.

Flores asserts that he "is left hand dominant and has a permanent injury to his right hand," which is inconsistent with what Harris described. (*Id.*).

Flores's sworn statement to the police and his deposition have internal inconsistencies, including whether Flores saw the officers before the shooting, and whether Flores reached for his gun before Harris shot him. (*Compare* Docket Entry No. 103-1 at 6, *with* Docket Entry No. 114-2 at 10; *see also* Docket Entry No. 115-1 at 13). The Department's investigative report contains a summary of another interview with Flores in October 2015, in which he explained that he did not see or hear the officers announce themselves before he was shot. He also explained that he reached toward "the right side of his waist" to hold the gun because he felt it "fall down his shorts before the shooting." (*Id.* at 7–8). In that interview, Flores stated that the handle of his gun was visible at his waistband. (*Id.* at 8). However, Flores's statements—his July 23, 2015, interview with the police; his October 6, 2015, sworn statement to the police; and his August 13, 2018, deposition—are consistent in recording him as denying that he reached for the gun or aimed it at any person. (*See* Docket Entry No. 115-1 at 48; Docket Entry No. 101-1 at 4–5, 6, 8). According to Flores, he never turned to face the officers. Instead, he simply "heard a gun shot" and fell to the ground. (Docket Entry No. 103-1 at 6; Docket Entry No. 114-2 at 10). Flores argues that the fact that he was shot in the back supports the inference that he had not turned to face the officers or to point his gun toward them before Harris fired at Flores. (Docket Entry No. 112 at 7, 24, 25).

In response, the officers present an expert report from a forensic scientist, Edward Hueske, who explains that his research shows "an officer can legitimately be firing while facing the suspect only to have the suspect turn and be struck in the back." (Docket Entry No. 110-10 at 6). His expert opinion is consistent with the officers' statements that they saw Flores holding a gun that he raised

while turning his torso to point the gun toward Harris before Harris fired.

There are genuine factual disputes material to determining whether Harris was reasonable in believing that Flores was holding a gun; that he had raised the gun; and that he was turning his upper body toward Harris and was pointing the gun toward Harris, so as to justify Harris's use of deadly force. The conflicting evidence is material to determining whether Harris had probable cause to believe that Flores posed a significant threat of death or serious injury to Harris or others. *Flores*, 381 F.3d at 399. The record evidence is disputed and does not allow the court to rule that, as a matter of law, Flores pointed a gun at Harris or even reached for it before the shooting. Viewing the evidence in the light most favorable to Flores, a reasonable jury could find that an officer in Harris's position would not have had probable cause to believe that Flores posed an immediate threat of serious harm. Harris and Mawhood testified that Flores pointed his gun at Harris; Flores's statements dispute that. Flores testified that he was unaware of the officers' presence, was not holding or raising his gun, and did not point a gun at the officers before Harris shot him. Mawhood's testimony does not resolve the disputes but adds to them. Mawhood explained in his September 2015 administrative statement that Harris told him that Flores "looked like" he "had something in his hand," and that once Flores began to jog and then crouched by a car, Harris said that Flores had a gun, which Mawhood did not see. (Docket Entry No. 103-3 at 3).

"[I]n an excessive force-case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party's favor." *Mason v. Lafayette City–Par. Consol. Gov't*, 806 F.3d 268, 276 (5th Cir. 2015). Under this standard, a reasonable jury could find that Harris's use of force was excessive. Flores's version of events, if credited by a jury, would establish that he was not holding or aiming his gun when he

moved quickly through the parking lot and crouched beside a car, or making other threatening gestures that could justify the use of deadly force. The record has presented contradictory and conflicting evidence sufficient to raise factual disputes "material to the resolution of the question[] whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993).

The majority of Fifth Circuit cases concluding that an officer's use of deadly force was objectively reasonable have involved situations in which the victim was actively resisting arrest, ignoring verbal commands, or was identified through a warrant as posing a safety risk to others. For example, in *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009), the Fifth Circuit upheld the district court's conclusion that an officer's use of deadly force was justified after the deceased had been stopped and ignored several verbal commands from the officer to show his hands and instead reached under the seat of his car. *Id.* at 844. The Fifth Circuit explained that the deceased had not challenged "the *only* fact material to whether [the officer] was justified in using deadly force: that [the deceased] reached under the seat of his vehicle and then moved as if he had obtained the object he sought." *Id.* Similarly, in *Mendez v. Poitevent*, 823 F.3d 326 (5th Cir. 2016), the Fifth Circuit concluded that an officer's use of deadly force against a suspect was reasonable because "[i]n the moments leading up to the shooting, [the suspect] had struggled violently and aggressively against" the officer, the officer's earlier attempts to subdue the suspect had failed, and the suspect had taken the officer's baton and radio, struck the officer on the temple, and appeared to be reaching for the officer's weapon. *Id.* at 332; *see Colston v. Barnhart*, 130 F.3d 96 (5th Cir. 1997).

By contrast, in *Hobart v. Estrada*, 582 F. App'x 348 (5th Cir. 2014), the district court denied a summary judgment motion based on the qualified immunity of an officer who shot an unarmed,

mentally ill 19-year-old man who had hit the officer and was advancing toward him again when the officer shot him. *Id.* at 355. The officer had testified that the man "turned, saw him, loudly 'roared,' raised his arms to waist level and began to charge,' ultimately striking the officer in the face." *Id.* at 352. The officer "believed his life was in danger because '[he] remember[ed] seeing stars.'" *Id.* at 353. The man's mother testified that she saw her son "flailing his arms as he went toward the door and that his arms hit [the officer's] arms, but she never saw [the man] hit [the officer] in the head." *Id.* at 354. The Fifth Circuit concluded that the factual disputes about whether the force used was reasonable relative to the threat meant that the officer "failed to establish that his use of deadly force was reasonable." *Id.* at 355. The officer was not entitled to summary judgment based on qualified immunity. *Id.*

Flores's case sits between cases like *Mendez* and *Hobart*. The summary judgment evidence is undisputed that Flores had a loaded gun before the shooting. The record presents conflicting testimony and other evidence about whether the handle of the gun was visible to the officers when they saw Flores in the parking lot; whether he was holding the gun; whether Harris and Mawhood were in uniform; whether either identified themselves as police officers; whether Flores was facing Harris; or whether Flores had raised the gun and pointed it toward Harris. (*See* Docket Entry No. 101-1 at 4, 7, 8; Docket Entry No. 115-1 at 51, 53). Flores and Vargas both testified that Flores was not holding a gun when Harris fired at Flores and that neither Harris nor Mawhood announced themselves as officers or commanded Flores to raise his hands or drop his gun. Unlike *Mendez* and *Manis*, the officers had not received prior warnings about Flores that would have suggested that he was armed or an immediate danger to the officers or others.

Flores offers evidence of a factual scenario under which Harris's use of force would be

34

objectively unreasonable and without probable cause, in violation of clearly established Fourth Amendment law. That is not to say that Flores's version of the events is credible, true, or correct. It does mean that on this factually disputed record, Harris is not entitled to qualified immunity as a matter of law. Based on the evidence before the court, there are genuine and material factual disputes that must be resolved to determine whether Harris's actions were objectively reasonable in light of the circumstances. The motion for summary judgment on Flores's excessive-force claim against Harris is denied. (Docket Entry No. 102).

## B.    Illegal Arrest

While the amended complaint is unclear, it appears that Flores also alleges that his warrantless arrest after he was shot violated the Fourth Amendment. (*See* Docket Entry No. 78 at ¶ 398 (alleging "Wrongful Prosecution"); *id.* at ¶ 374 (alleging that the officers "unlawfully search[ed] and seized Mr. Flores in violation of the [F]ourth Amendment")). He argues that there was "no probable cause to arrest him" because "he was walking in the parking lot of La Estancia Apartment conversing with two friends and at no time did he ever have a gun in his hand, wave a gun around, [or] turn around toward Officer Harris with a gun pointed at him." (Docket Entry No. 112 at 29). While Flores concedes that an officer may arrest an individual without a warrant if probable cause exists, Flores asserts that "no crime was committed in the officers['] presence." (*Id.* at 30). The officers argue that because Flores later pleaded guilty to unlawfully carrying a weapon, his illegal-arrest claim is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). (Docket Entry No. 120 at 7). In response, Flores argues that the court should "not take judicial notice of the hearing officers['] order in *State v. Flores*" because "all the facts in the case were not known an[d] the statements by the officers contained false statements including but not limited to the fact they claim

to have shot [Flores] in the chest shoulder area."  (Docket Entry No. 112 at 31).

There is and was in 2015 a constitutional right to be free from a warrantless arrest without probable cause.  *Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998)*; Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007).  In *Heck*, the Supreme Court explained that:

> to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus [under] 28 U.S.C. § 2254.

*Heck*, 512 U.S. at 486–87.  If a judgment for the plaintiff on the § 1983 claim would "necessarily imply the invalidity of his conviction or sentence," then the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  *Id.*  A damages claim related to a conviction or sentence that has not been invalidated cannot proceed under § 1983.  *Id.*

Flores alleges that Harris unlawfully arrested him without probable cause.  But after his arrest, Flores pleaded guilty to unlawfully possessing a weapon and was convicted.  Flores's unlawful arrest claim directly challenges the validity of his criminal conviction.  Flores does not show that his conviction has been invalidated or set aside.  His civil unlawful arrest claim cannot proceed, and the court grants summary judgment to the officers on this claim.  *Cf. Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (claims barred by *Heck* are "dismissed with prejudice to their being asserted again until the Heck conditions are met").

## C.      Racial Discrimination

Flores alleges that the officers violated the Fourteenth Amendment because his "shooting and subsequent arrest . . . were based on racial discrimination."  (Docket Entry No. 112 at 32).  He

alleges that the officers "became suspicious when they saw three Hispanic [m]ales walking across a parking lot . . . in a predominately Hispanic area of Houston." (*Id.*). Flores rejects the officers' explanation that their suspicion rested partially on the fact that the "area [was] known for gang and criminal activity," because "[b]ased on [that] logic[,] any [H]ispanic male living in an area that has gang activity or high crime would be suspicious." (*Id.*). Flores argues that none of his actions was suspicious. (*Id.* at 33). Instead, he claims, the shooting occurred because Harris racially profiled Flores. (*Id.*).

"The Constitution does not tolerate intentional police harassment of racial minorities." *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989) (en banc), *abrogated on other grounds by Harper v. Harris Cty.*, 21 F.3d 597 (5th Cir. 1994). For Flores to prevail on his claim that the officers violated equal protection, he must show that the officers acted with a discriminatory purpose, *see McCleskey v. Kemp*, 481 U.S. 279, 292 (1987), and that he was treated differently from similarly situated individuals who were not Hispanic, *see Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004).

While Flores is a member of a protected class, he has not presented summary judgment evidence that could provide a reasonable jury a sufficient basis to find an equal protection violation. That the officers "were suspicious because they were in an area known for gang and criminal activity" and that area has a large Hispanic population cannot provide the basis for the inference that a discriminatory purpose motivated the officers. Because Flores has not offered or identified evidence supporting an inference that the officers' actions on July 22, 2015, were motivated by Flores's race, the court grants summary judgment for the officers on this claim.

**D.     Denial of Timely Medical Care**

Flores alleges that Mawhood and Harris violated his constitutional rights by failing to provide adequate and timely medical care.  Flores's own expert, Howse, states that based on his review of the evidence, "the emergency medical response requested by Officer Harris and provided by the Houston Fire Department was reasonable and consistent with the expectations of large municipal public safety agencies."  (Docket Entry No. 114-13 at 7–8).

Howse also states that the record shows that "Flores did not receive any medical treatment from [the Houston Police Department] until approximately ten minutes after he was shot by Officer Harris" and that "there is no indication that Officer Harris or Officer Mawhood attempted to provide any emergency medical care to Mr. Flores as he lay bleeding from his gunshot wound inflicted by Officer Harris."  (*Id.* at 8).  Howse opines that the failure to provide medical care for ten minutes "is not consistent with established police training policies and procedures, nor is it consistent with the Law Enforcement Code of Ethics."  (*Id.* at 9).

"The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by police is entitled to medical care."  *Carter v. Reach*, 399 F. App'x 941, 942 (5th Cir. 2010); *see Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996) ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment.").  An officer's deliberate indifference to a serious injury violates that right.  *Carter*, 399 F. App'x at 942.  Meeting this standard requires showing that the officer was "aware of a substantial and significant risk . . . but effectively disregarded it."  *Jacobs v. West Feliciana Sheriff's Dep't*, 229 F.3d 388, 395 (5th Cir. 2000)..  In the context of an arrestee, the plaintiff must

show that: (1) the official knew of facts leading to an inference of a substantial risk of serious harm to the plaintiff; (2) the official drew that inference; (3) and the official's actions indicate that the official intended the harm. *Thompson v. Upshur Cty.*, 245 F.3d 447, 458–59 (5th Cir. 2001).

To preclude summary judgment, a plaintiff must point to evidence from which a reasonable factfinder could conclude that the officer "refused to treat [the plaintiff], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical need." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1236 (5th Cir. 1986)). An official's negligent, or even grossly negligent, actions are insufficient for an inference of deliberate indifference. *Thompson*, 245 F.3d at 459. Delay in providing medical care gives rise to a constitutional violation if the deliberate indifference results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Harris and Mawhood were immediately aware that Harris had fired his gun, and shortly after were both aware that Flores had been shot. Although the officers obviously understood that the gunshot would present a serious risk of injury, Flores has not presented or identified evidence that could support an inference that the officers violated his Fourteenth Amendment rights in delaying medical care. There is no factual basis to infer that the officers subjectively intended further harm to Flores. Instead, the record shows that they immediately contacted Emergency Medical Services after handcuffing the suspects. EMS personnel arrived on the scene within ten minutes. The fact that the officers did not attempt amateur first aid in the interim, when the extent of the injury was so unclear, does not support an inference of deliberate indifference. Flores also does not provide evidence that the delay in medical care worsened his injury or caused him further harm.

The court grants summary judgment to the officers on Flores's § 1983 claim for delay in medical care.

**V.      Flores's State-Law Claim Against the Officers**

Government officials in Texas are entitled to official immunity, which is "substantially the same as federal qualified immunity law." *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997). An official performing a discretionary duty in good faith is not personally liable to a plaintiff. *McIntosh v. Partridge*, 540 F.3d 315, 326 (5th Cir. 2008); *see City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). An official acts in good faith when "a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004). The "good faith" test under Texas law is substantially the same as the qualified immunity test for § 1983 actions. *Meadours v. Ernmel*, 483 F.3d 417, 424 (5th Cir. 2007); *Mowbray v. Cameron Cty.*, 274 F.3d 269, 280 (5th Cir. 2001).

**A.      Negligence**

Flores alleges that Harris was negligent by "[f]ailing to prevent injury to others when it reasonably appeared" that his actions would cause injury or create a dangerous condition; "fail[ing] to exercise reasonable care to avoid a foreseeable risk of injury to Mr. Flores"; not "tak[ing] affirmative action to control or avoid increasing the danger from a condition that had been at least partially created by his conduct"; and failing to "use ordinary care in aiding or protecting others from peril when the peril was under his control." (Docket Entry No. 78 at ¶ 317). Flores argues that his negligence claim "is based on the fact that [O]fficer [H]arris failed to identify himself to the defendant before shooting him in the back." (Docket Entry No. 113 at 40).

As noted above, there are genuine factual disputes material to determining whether Harris identified himself as an officer before shooting Flores, whether Harris had probable cause for his actions, and whether Harris used the appropriate level of force in good faith under the circumstances and in compliance with the Houston Police Department's use-of-force policy.

Under Texas law, negligence requires showing duty, breach, causation, and damages. *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 265 (Tex. App. 2000). Foreseeability and likelihood of a risk are the primary factors in determining if one party owed the other a duty that was breached. *Wal–Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 130 (Tex. App.—Corpus Christi 1997, pet. denied). "To establish proximate cause, a plaintiff must prove foreseeability and cause in fact." *Ambrosio*, 20 S.W.3d at 265.

Under the Texas Tort Claims Act, a party cannot bring a tort action against both a government employee and the government unit for which he works. TEX. CIV. PRAC. & REM. CODE § 101.106(e) ("If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit."). "Section 101.106 is an immunity statute and precludes claims against a governmental employee involving the same action, transaction, or occurrence without regard to whether the action against the employee is based on the same cause of action." *Holland v. City of Houston*, 41 F. Supp. 2d 678, 717 (S.D. Tex. 1999). As long as the claim "involve[s] the same subject matter as the action brought against the governmental entity," then the claim against the employee is precluded. *Id.* (citing *Dallas Cty. Mental Health v. Bossley*, 968 S.W. 2d 339, 343 (Tex. 1998); *Newman v. Oberstellar*, 960 S.W.2d 621, 622 (Tex. 1997)). A suit against a government employee is a suit against the government entity. *Univ. of Tex. Med. Branch at Galveston v.*

*Hohman*, 6 S.W.3d 767, 777 (Tex. App.—Houston [1st Dist.] 1999, pet. dismissed w.o.j.).

"[W]hether a plaintiff sues a governmental employee in the employee's official or individual capacity is irrelevant under the applicable subsections of section 101.106." *Tex. Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 400 (Tex. App.—Fort Worth 2008, no pet.). Flores has made clear in his responses that he is suing the City under state law for the shooting. He explained in his response to the defendants' motion to dismiss that he has pleaded "the basis for punitive damages against City defendant with [his] claim of gross negligence." (Docket Entry No. 98 at 25 (citing Docket Entry No 78 at ¶¶ 61, 393)). He also alleges in the section labelled "Count 5—Negligence of Defendant, Thomas Lloyd Harris" that if the City moved to miss the state-law claims against Harris, it would waive its sovereign "immunity when a personal injury occurs as a result of deliberately indifferent tortuous act . . . involv[ing] the use of tangible [C]ity property." (Docket Entry No. 78 at ¶ 317).

Flores cannot sue Harris for negligence while simultaneously suing the City for the same event. The court grants the officers summary judgment on this claim.

### B.    The Texas Constitution

Flores alleges that the defendants have violated Article I, § 19 of the Texas Constitution because Harris shot him "without justification, unreasonably and with excessive force" and deprived Flores of his liberty. (Docket Entry No. 78 at ¶ 318). The defendants argue that Flores has failed to allege the elements necessary to state a claim under this section and to explain what relief he seeks for the alleged violation. (Docket Entry No. 100 at 16). The defendants also argue that the claim fails because, as a matter of law, Flores cannot recover tort damages for a violation of the Texas Constitution. (*Id.* at 16–17).

Section 19, the Due Course Clause of the Texas Constitution, states:

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19. The Texas Supreme Court has concluded that "due course" is based in the federal Constitution's due process and there is no meaningful distinction between the two. *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). Courts apply federal due process standards to claims under § 19. *See id.*; *Tex. Emp't Comm'n v. Remmington York, Inc.*, 948 S.W.2d 352, 357 (Tex. App.—Dallas 1997, n.w.h.).

A plaintiff cannot recover damages for violations of the Texas Constitution. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148 (Tex. 1995); *see also RBIII, L.P. v. City of San Antonio*, No. SA-90-CV-119-XR, 2010 WL 3516180, at *7 (W.D. Tex. Sept. 3, 2010) ("Texas Courts have held that the 'due course of law' clause of section 19 provides no private cause of action for damages."). A plaintiff may seek equitable relief under § 19. *Patel v. City of Everman*, 179 S.W.3d 1, 13 (Tex. App.—Tyler 2004, pet. denied); *Securtec, Inc. v. Cty. of Gregg*, 106 S.W.3d 803, 816 (Tex. App.—Texarkana 2003, no pet.). To the extent that Flores seeks damages, his claim under Article I, § 19 fails as a matter of law and summary judgment on this issue is granted to the City and the officers.

Flores argues in his response to the officers' motion for summary judgment that he does seek equitable relief under the Texas Constitution. (Docket Entry No. 112 at 22). Flores does not state the equitable relief he seeks, but he argues that the court should not dismiss this claim simply because he does not seek damages. (*Id.* at 22–23). The officers argue that Flores has claimed injunctive relief "for the first time in his response," making it improper to consider. (Docket Entry

No. 120 at 5). They also argue that Flores has not pleaded facts sufficient to show that he would be entitled to this "extraordinary remedy." (*Id.*). The officers assume that "Flores seeks injunctive relief in the form of an order imposing a duty on the [officers] to redeem his reputation," and argue that "they are immune from a suit seeking [the] imposition of an affirmative duty based on a past alleged actionable wrong." (*Id.*).

The fourth amended complaint is not clear about what relief that Flores seeks under the Texas Constitution. The complaint includes a "Damages" section that also requests unspecified equitable relief. (*See* Docket Entry No. 78 at ¶¶ 377–98). Flores seeks:

> Equitable relief, including, without limitation, that City of Houston-Police . . . Department, Officers Mawhood, and Harris be made to apologize and City of Houston to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein; [s]uch other relief, including injunctive and/or declaratory relief, as the court may deem proper.

(*Id.* at ¶¶ 388–89).

Flores's assertion that he seeks equitable relief under the Texas Constitution is a new argument on summary judgment. In his response to the defendants' motion to dismiss, Flores was aware of the defendants' argument that a plaintiff may not recover damages under Art. I, § 19. However, his response stated only that he was "seeking monetary damages for his claims under the Texas Constitution" and that the defendants lacked immunity. (Docket Entry No. 98 at 16). Flores has not explained how the equitable relief he requests would redress the Texas constitutional injury he alleges. To the extent that Flores seeks the equitable relief of an apology from the officers, this claim under the Texas Constitution against Harris fails. There is no basis to find a duty on the part of the officers to apologize or that an apology would redress Flores's injury. And because there is no basis to find that Mawhood has violated Flores's rights under § 19, the court also grants summary

44

judgment to Mawhood on this claim. The court grants Harris's and Mawhood's motion for summary

judgment on Flores's claim for equitable relief under the Texas Constitution.

The request for relief against the City is analyzed below in the discussion of municipal

liability.

## VII. Municipal Liability

Flores alleged that "[a]s a result of City of Houston customs, policies, and practices," the

City encourages constitutional violations like those allegedly committed against Flores, making the

City liable for its "fail[ure] to adequately train, supervise, control and discipline its officers . . . such

that its failure to do so manifests deliberate indifference." (Docket Entry No. 78 at ¶ 332). Flores

alleges that the City "encourages future use of excessive deadly force; unlawful detentions; failures

to intervene; the delay of medical care . . . ; and race based policing." (*Id.* at ¶ 334).

### A. Municipal Liability Under 42 U.S.C. § 1983

Municipal liability requires proof of an underlying claim of a violation of rights and three

additional elements: "a policymaker; an official policy; and a violation of constitutional rights whose

'moving force' is the policy or custom." *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005)

(quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). For the City to be liable

based on an unconstitutional policy, practice, or custom, "the plaintiff must show, among other

things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation

of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers

'with deliberate indifference as to its known or obvious consequences.'" *Johnson v. Deep E. Tex.*

*Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (emphasis in original)

(quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)). "A showing of

simple or even heightened negligence will not suffice." *Bryan Cty.*, 520 U.S. at 407.

An "official policy" is a policy statement, ordinance, or regulation that has been officially adopted by a policymaker. *Johnson*, 379 F.3d at 309. A policy may be a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy. *Id.*; *Bryan Cty.*, 520 U.S. at 403–04. "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 639 (5th Cir. 2010).

"[P]roof of a single instance of unconstitutional activity is [generally] not sufficient for § 1983 liability." *Valentine Found. v. Uphoff*, 211 F. App'x 276, 278 (5th Cir. 2006) (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)); *see also Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (proof of deliberate indifference "generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights'" (quoting *Thompson*, 245 F.3d at 459)); *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("[t]o succeed on his claim of failure to train or supervise" the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to "demonstrate a pattern of violations"); *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 288 (5th Cir. 2002); *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) ("proof of a single violent incident ordinarily is insufficient" for liability; the "plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured'" (quoting *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir. 1989)).

Deliberate indifference in a failure-to-train case requires the plaintiffs to "show that the failure to train reflects a 'deliberate' or 'conscious' choice to endanger constitutional rights." *Snyder*, 142 F.3d at 799 (citing *City of Canton*, 489 U.S. at 389). Notice of a pattern of similar violations is generally required. *See Roberts v. City of Shreveport*, 397 F.3d 287, 294 (5th Cir. 2005) (rejecting the plaintiffs' proffered pattern because it was at "an excessively high level of generality"); *see also Burge*, 336 F.3d at 371 (the evidence must be "sufficient to establish deliberate indifference or knowledge" that a constitutional violation "would be a highly likely consequence"); *cf. Bryan Cty.*, 520 U.S. at 412 (a finding of supervisory liability for inadequate screening "depend[s] on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff"). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks omitted). The policymaker must have either actual or constructive knowledge of the alleged policy, practice, or custom. *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) ("Actual or constructive knowledge of a custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.1984). The cases require that the prior acts be fairly similar to the alleged violation at issue. *See, e.g., Snyder*, 142 F.3d at 798 (the "plaintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured." (internal quotation marks and citation omitted)).

The Fifth Circuit has characterized the "single incident exception" to the general rule requiring a pattern of violations as inherently "a narrow one, and one that we have been reluctant to expand." *Burge*, 336 F.3d at 373 (citing *Pineda v. City of Houston*, 291 F.3d 325, 334–35 (5th

Cir.2002)); *see also Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) ("We have consistently rejected application of the single incident exception and have noted that 'proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training.'" (quoting *Snyder*, 142 F.3d at 798)); *Conner v. Travis Cty.*, 209 F.3d 794, 797 (5th Cir. 2000). "To rely on this exception, a plaintiff must prove that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Roberts*, 397 F.3d at 295 (quoting *Brown*, 219 F.3d at 461). The Fifth Circuit found a single incident sufficed in *Brown v. Bryan County* because the county failed to provide any training or supervision for a young, inexperienced officer with a clear prior record of recklessness. *Brown*, 219 F.3d at 463. In *Roberts*, the court noted the difference between a complete failure to train—as in *Brown*—and a failure to train in a limited area. *Roberts*, 397 F.3d at 295–96 (distinguishing *Brown*, 219 F.3d).

## B.    Excessive Force

Flores alleges that Harris's use of deadly force violated his Fourth Amendment rights and that the City is liable for this violation. (*See* Docket Entry No. 78 at ¶¶ 321–23). The City argues that Flores has not presented or identified evidence that could show that a City or Houston Police Department policy, practice, or custom caused Flores's constitutional injury. (Docket Entry No. 100 at 19–20). According to the City, the evidence instead shows that its official policy clearly limits an officer's use of force; Flores does not identify a widespread custom or practice that could raise a factual dispute on the City's liability; and Flores has not presented or identified evidence that could show deliberate indifference or liability by ratification. (*Id.* at 20, 24).

### 1.    A City Policy, Practice, or Custom

The summary judgment evidence includes the Houston Police Department's General Order 600-17 on the use of force, which states in relevant part as follows:

> When dealing with citizens, suspects, and prisoners, employees will limit their use of force and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control.
>
> In every situation in which a firearm, soft-impact weapon, or a conducted energy device (CED) is discharged, even if the suspect is not struck, officers will notify the Command Center, write a detailed incident report, and the on-scene supervisor will make a supplement.

(Docket Entry No. 100-12 at 2).

The Policy requires that officers "who use force against any person must be able to state in detail the specific reasons for using force," and instructs that "[i]t is the duty of all employees to constantly assess the situation and adjust the use of force accordingly." (*Id.*). The Policy includes a subsection on deadly force, which states:

> The use of deadly force will be limited to those circumstances in which officers reasonably believe it is necessary to protect themselves or others from the imminent threat of serious bodily injury or death. Officers will consider their immediate surroundings and the safety of involved citizens before using deadly force.
>
> Employees will not justify the use of deadly force by intentionally placing themselves in imminent danger.
>
> Officers are prohibited from using firearms in the following ways:
>
> a.  Firing warning shots
>
> b.  Firing at fleeing suspects who do not represent an imminent threat to the life of the officer or another.
>
> c.  Firing at suspects whose actions are a threat only to themselves (e.g., attempted suicide).

(*Id.* at 3-4). The City also offers as evidence the Houston Police Department's General Order 500-01, which repeats the language of General Order 600-17 on the use of force. (Docket Entry No.

100-13 at 2).

The written policies do not support Flores's claim of municipal liability. Instead, the City Policy limits the officers' use of force in interactions with suspects and civilians. Harris testified in his deposition that he was aware of the Houston Police Department's Policy on the use of force, explaining that he understood that he was permitted to use force only "[t]o stop the threat of imminent threat of serious bodily injury to himself or someone else." (Docket Entry No. 115-5 at 61). He also recounted that his training included "scenarios in which you would use deadly force," which suggests that the Department transmitted the Policy through its training. (*Id.* at 50). Mawhood similarly stated in his deposition that he received training on, and was aware of, the Department's Policy on the use of force. (Docket Entry No. 115-6 at 53-56).

Flores argues that there is a prior pattern of excessive force that supports finding an unwritten policy or custom permitting officers to use excessive force. (*See* Docket Entry No. 78 at 332-69). The fourth amended complaint lists over 15 instances in which Houston Police Department officers allegedly used excessive force. (*Id.*). The complaint also alleges that more than 400 officers have participated "in the killing or wounding of civilians since January 1, 2004," but only one officer has been indicted and none has faced internal discipline. (*Id.* at 338). Flores includes in his summary judgment evidence over 1,000 pages of Houston Police Department internal investigation reports. This exhibit may not be proper summary judgment evidence because Flores failed to comply with the protective order requiring it to be filed under seal. (*See* Docket Entry No. 11). Even considering these reports, Flores fails to raise a factual dispute material to determining that the City is not liable for the shooting.

The question is whether the prior uses of excessive force that Flores cites raise a fact issue

as to a pattern that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). The answer is that they do not. Prior incidents may show a pattern if they "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.2d at 842. A plaintiff must show "a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582 (citations omitted). A pattern requires "sufficiently numerous prior incidents," not "isolated instances." *McConney*, 863 F.2d at 1184.

In *Peterson v. City of Forth Worth*, 588 F.3d 838 (5th Cir. 2009), an inmate presented evidence that, according to the City's internal affairs records, at least 27 complaints of excessive force were filed between 2002 and 2005. Almost all arose from officers' investigations into petty crimes. The injuries ranged from minor lacerations to broken bones. In concluding that this evidence did not show a pattern, the Fifth Circuit explained:

> The incidents allege use of force that, if true, would be emphatically excessive. Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force. The failure of the evidence is that the plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy. For example, the record does not indicate the size of the Forth Worth Police Department or how many arrests were made by the department between 2002 and 2005. We have previously indicated that the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. . . . Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of *respondeat superior*, which is expressly prohibited by *Monell*.

> Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy. The burden of providing a context that would show such a pattern falls on the plaintiff, not on the City, and Peterson has failed to meet that burden. No reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force.

*Peterson*, 588 F.3d at 852 (citations omitted). The evidence in this record of other instances of alleged excessive force by Houston Police Department officers similarly lacks the necessary context of the overall number of arrests, police encounters, or comparisons to other cities.

Flores also fails to explain, or to provide or identify, evidence that shows how the events he lists involving Houston Police Department officers using excessive force are sufficiently similar to each other and to Harris's actions on July 22, 2015, to show a pattern. *See, e.g., Oporto v. City of El Paso*, No. EP-10-CV-110-KC, 2012 WL 2191697, at *5 (W.D. Tex. June 14, 2012) (rejecting as evidence of a pattern 32 purportedly similar incidents of police misconduct over 15 years); *see also Estate of Davis ex. Rel McCully v. City of N. Richland Hills*, 406 F.3d 375, 382–84 (5th Cir. 2005). "Proving a pattern is a heavy burden, one that has rarely been met in our caselaw." *Hare v. City of Cornith*, 74 F.3d at 645 (5th Cir. 1996) (en banc). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration omitted).

The evidence does not raise a fact issue as to a pattern rising to the level of a policy or custom of failing to train, or of using or condoning excessive force, under circumstances similar to those alleged here. Flores does not explain, and the summary judgment evidence does not show, that the listed excessive-force events have sufficiently similar facts to create a pattern. For example, Flores does not present or identify evidence showing that the victims in these cases were injured

without receiving a clear verbal warning from the officer or that the victims were shot while turned away from the officer, or that the victims were not making any threatening gestures that could justify deadly force. The bare list itself does not give rise to a factual dispute material to finding a pattern sufficient to support a municipal policy or action.

### 2.    Moving Force

The City is also correct that Flores does not present or identify evidence that could show genuine factual disputes material to determining whether a City policy, practice, or custom was the moving force behind Flores's constitutional injury. "Although an official policy can render a municipality culpable, there can be no municipal liability unless it is the moving force behind the constitutional violation." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 580). A plaintiff must show that the policy directly caused the violation. *Id.*; see *Bd. of the Cty. Comm'rs v. Brown*, 520 US. 397, 404 (1997). "This connection must be more than a mere 'but for' coupling between cause and effect." *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992). "The plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411.

*James v. Harris County*, 577 F.3d 612 (5th Cir. 2009), is instructive. In *James*, the family of a victim shot by a police officer sued Harris County, arguing that the County had a policy of allowing the District Attorney to review and handle officer shootings. On appeal, the Fifth Circuit assumed that an unconstitutional policy existed and limited its review to whether the family had shown that the policy was the moving force behind the shooting of the victim. In reviewing the evidence, the Fifth Circuit emphasized that the family had to offer evidence showing that the officer

understood that it was the County's policy to conduct only cursory investigations of officer-involved shootings. The officer's testimony showed that he was aware that the District Attorney investigated these shootings, but the family had not presented evidence that the officer knew of an alleged policy of avoiding thorough investigations.

The Fifth Circuit explained:

> [T]o show that the policy was the cause of Wilkinson's use of excessive force, the family was required to establish knowledge of the policy through other means. To that end, the family sought to establish that a policy of not conducting a thorough investigation of officer-involved shootings was so widely known that it created in the department an expectation of impunity for the use of excessive deadly force, and Wilkinson's personal knowledge could be assumed. To establish that the policy was widely known, the family relied exclusively on the expert testimony from Dr. David A. Klinger, a criminologist, that line officers tend to break institutional rules if they are not enforced. . . . The district court accepted Dr. Klinger's expert testimony to the extent it sought to establish that, generally, line workers will break rules if they are not enforced. But the district court expressly forbade Dr. Klinger from opining that Wilkinson had knowledge of the alleged policy, on the grounds that there was no evidence from which this fact could be established. The district court further rejected Dr. Klinger's testimony to the extent that it concluded that the alleged policy was widely known among the department's deputies; it reasoned that Dr. Klinger had failed to offer any empirical evidence relating to the Harris County Sheriff's Department that could connect his general theory to the facts of this case. That is to say, no evidence was offered from which it properly could be inferred that it was common knowledge in the Sheriff's Department, through "informal networks of communication" (to use the expert's words), that the Sheriff's investigation and discipline for officer-involved shootings was lax. . . . A reasonable jury could not find that the alleged policy was the moving force behind Wilkinson's alleged excessive force, when there was no evidence that Wilkinson had knowledge of such policy.

*Id.* at 618–20.

Flores alleges that the City facilitated the use of excessive force "by failing to adequately investigate, punish, train, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe that their actions will never be meaningfully scrutinized." (Docket Entry No. 78 at 333). Here, the Flores's expert, Howse, concluded that the City has "a

clear pattern and practice of exonerating HPD officers when they use deadly force against an individual." (Docket Entry No. 115-3 at 10-11). His conclusion is based on a review of "more than 600 individual use of deadly force cases (including persons, animals and accidental discharges) involving Houston police officers" from 2007 to 2012. (*Id.* at 10). He found that "in the 170 times a Houston police officer killed or wounded a citizen, 100% of deadly force incidents were ruled as justified by [the] HPD." (*Id.*). He also pointed to a *Houston Chronicle* investigation stating that from 2008 to 2012, the Houston Police Department's Internal Affairs Division found only one shooting not justified. (*Id.* at 11).

As in *James*, neither the expert report nor other evidence supports the inference that a City policy or custom was the moving cause of Harris's July 2015 shooting. Howse did not point to evidence showing that the officers were aware of how the Internal Affairs Division treated deadly force cases or that this encouraged Harris to use deadly force. *See James*, 57 F.3d at 620. Flores has not pointed to evidence that might fill in this gap in the necessary causal connection between the City policy or custom he alleges and Flores's injury. Flores has not identified disputed facts material to determining whether this City policy or custom was the moving force behind the alleged use of excessive force.

The court grants the City's motion for summary judgment on Flores's § 1983 claim against the City for excessive force.

## C.     Failure to Train in the Use of Force

Flores alleges that the City "fail[ed] to adequately train, supervise, control and discipline its officer, including Harris and Mawhood." (Docket Entry No. 78 at 332). The complaint alleges that the Houston Police Department did not provide officers training on off-duty work or training on the

use of force while doing off-duty work; require Harris and Mawhood to receive training after the shooting; or require other officers to receive training after investigations into the use of excessive force. (*Id.* at ¶¶ 51, 56, 219, 220, 230, 232, 234–262).

The City argues that Flores has not pointed to evidence that could create a factual dispute material to his claim that the City inadequately trained, investigated, or disciplined its officers. (Docket Entry No. 100 at 23). Instead, the City asserts, "the evidence clearly establishes that the Defendant Officers have been trained in accordance with state standards and acted in compliance with the duties as well as applicable laws." (*Id.*).

For a municipality to be liable for failure to train, "the focus must be on the adequacy of the training program in relation to the tasks the particular officer must perform." *Snyder*, 142 F.3d at 798 (quoting *City of Canton*, *v. Harris*, 489 U.S. 378 390–91 (1989)). "It is clear that a municipality's policy of failing to train its police officers can give rise to § 1983 liability." *Brown v. Bryan Cty.*, 219 F.3d 450, 457 (5th Cir.2000) (citing *City of Canton*, 489 U.S. at 390). A plaintiff relying on a failure-to-train liability theory must show a causal link between the failure to train and the constitutional violation and must show that the failure to train amounts to deliberate indifference. *City of N. Richland Hills*, 406 F.3d at 382–84; *City of Canton*, 489 U.S. at 385.

"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," a municipality might reasonably be found to be deliberately indifferent. *City of Canton*, 489 U.S. at 390; *see also Snyder*, 142 F.3d at 798. The Fifth Circuit has explained that in such cases,

> [c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities,

as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Webster*, 735 F.2d at 842 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc), *cert. denied*, 472 U.S. 1016 (1985)).

An adequate training program must "enable officers to respond properly to the usual and recurring situations with which they must deal." *City of Canton*, 489 U.S. at 391. In this inquiry, proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability. *Snyder*, 142 F.3d at 798. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability to the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390–91. For liability to attach based on an "inadequate training" claim, a plaintiff must allege and present evidence that could show with specificity how a particular training program is defective. *See Beavides v. Cty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992).

The summary judgment evidence includes the training records for both Harris and Mawhood. (Docket Entry Nos. 100-8, 100-9). Each received 60 hours of training on the use of force in July 1997. (Docket Entry No. 100-8 at 2; Docket Entry No. 100-9 at 2). Harris also received 8 hours of training on "Use of Force Options" in June 2017, after the La Estancia Apartments shooting. (Docket Entry No. 100-9 at 11). Mawhood testified in his deposition about the City's academy use-of-force training, which included classroom and field instruction. (Docket Entry No. 115-6 at 53-56). The summary judgment evidence also includes the deposition of Houston Police Lieutenant Bradley Moorefiled, who testified about the training that officers receive when they the force and on a continuing basis. (Docket Entry No. 115-7 at 4-8).

Flores has failed to point to record evidence raising an inference that the Department's

training procedures were inadequate. He has not offered or identified summary judgment evidence that responds to the City's argument that officers receive sufficient training in using their weapons. The Fifth Circuit has held that "when officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381–82 (5th Cir. 2010). Flores does not argue, and the summary judgment evidence does not show, that the Department fell below the state-mandated training for officers on the appropriate use of deadly force. Flores does not argue that the State's requirements are inadequate, much less specify how. While Flores argues that the City is liable for failing to provide training on the use of force when officers are working off-duty security jobs, he does not point to evidence that shows how the off-duty setting is substantially different, or that the general training that officers receive on the use of deadly force is insufficient for that setting.

Flores has not identified evidence that could show that, given Harris's experience and his training in the use of force and other police policies and legal requirements, his actions in shooting Flores were the "highly predictable consequence of a failure to train." *Estate of Davis*, 406 F.3d at 386. Flores has not provided or identified evidence that supports an inference that the Department's training policies on the use of force were inadequate or that the Department's training showed deliberate indifference to Flores's constitutionally protected rights. The court grants summary judgment to the City on Flores's claim for deficient training on the use of deadly force.

### D.        Failure to Provide and Adequately Train on the Provision of Medical Care

Flores alleges that the City is liable for the officers' "failure to render any medical care to Helder Flores after having detained him, pretrial, after shooting him in the back." (Docket Entry No. 78 at ¶ 328). He argues that the City has "waived sovereign immunity because its policy [of]

not encouraging its officers to render medical aid other than call for emergency services was the moving force of its officers' actions which were not objectively reasonable." (*Id.* at ¶ 329).

The City argues that Flores has failed to rase a factual dispute because "[t]he evidence in this case clearly established that Harris called out for an ambulance after securing the scene and [Flores] was transported to the hospital accordingly." (Docket Entry No. 100 at 26). The City contends that Flores "has not adduced any evidence of municipal acts that were officially sanctioned or ordered by the City as being the direct cause of his alleged injuries." (*Id.* at 27). Flores did not respond to the City's argument.

Flores's expert, Howse, questioned the officers' decision not to give Flores emergency medical aid while waiting for EMS to respond to the call. Howse notes that "[p]olice officers are routinely trained to render first aid to those with life threatening medical conditions," and that "all police academies in the state of Texas[] provide first responder emergency medical training to every police cadet." (Docket Entry 115-13 at 8). He asserts that Harris and Mawhood's failure to provide immediate first aid to the wounded Flores goes against the Law Enforcement Code of Ethics, a code written by the International Association of Chiefs of Police. (*Id.*). Howse asserts that if "the Houston Police Department does not train police officers in first aid and basic first responder medical care," their "practice is not consistent with established police training policies and procedures." (*Id.* at 9).

However, as discussed above, Flores has failed to provide or identify evidence that could show that the officers violated his constitutional rights by not providing immediate first aid. Without an underlying constitutional violation, Flores cannot sustain his claim that the City is liable for failing to provide and adequately train officers on providing first aid. *See Whitley v. Hanna*, 726

F.3d 631, 648 (5th Cir. 2013) ("[I]n adequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."). Because Flores has not offered or identified summary judgment evidence that raises a factual dispute material to determining whether there was an underlying constitutional violation for the failure to give Flores immediate medical aid, the court grants summary judgment to the City on this claim.

### E. Equal Protection

Flores alleges that the City violated his Fourteenth Amendment right to equal protection by including him in its Gang Database. He alleges that the Houston Police Department does not inform individuals when they are placed in the Database, even though employers and government agencies are able to find the names of the individuals in that Database. (*Id.* at ¶¶ 210, 211). He also argues that placement in the Database can be "use[d] to enhance any crime outside domestic violence, and driving offenses" and can impact jobs and housing opportunities. (*Id.* at ¶¶ 211, 217). Flores argues that the criteria used to decide whether to add someone to the Database are too easy to meet and that the City did not train officers on the proper use of the Database. (*Id.* at ¶¶ 197–99). He asserts that he "was profiled because he []is Latino, of Mexican descent" and he was "present in an area where gang members reside, and had tattoos." (*Id.* at ¶ 194). He argues that "there is no consideration that a person may reside in a gang area with their families" or that a "reliable informant or other individual" may have a motive in reporting a person as a gang member. (*Id.* at ¶ 197). Flores alleges that he was placed in the Database "without due process of law based solely on his race." (*Id.* at ¶ 326).

The City argues that Flores has not presented a basis for his claim because he has not pointed to evidence showing that his "placement in the Gang Database was the result of a City policy or

custom that was promulgated with deliberate indifference" or that including him in the Database injured him. (Docket Entry No. 100 at 26). The City argues that Flores's arguments are "nothing more than labels and unwarranted factual inferences" that fail to support the necessary elements of an equal protection claim. (*Id.*).

"To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Johnson v. Morel*, 876 F.2d 477, 479 (5th Cir. 1989), *abrogated on other grounds by Harper v. Harris Cty.*, 21 F.2d 597 (5th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229, 247–48 (1976)). "[O]fficial action will not be held unconstitutional solely because it results in racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977).

Flores has not pointed to evidence of intentional discrimination or discriminatory purpose in his challenge to the Gang Database. He has not identified summary judgment evidence of the percentage of Hispanic individuals in the Database, as compared to individuals of other races. Nor has he compared the racial demographics of those in the Database to the relevant population.

Flores's central piece of summary judgment evidence for this claim supports the City's argument. He offers the deposition testimony of Houston Police Department Sergeant Ponder, who is assigned to the Department's gang-intelligence unit. (Docket Entry No. 115-7 at 64). Ponder testified that in 2015, the decision of whether to place an individual in the Gang Database was based on state-law criteria, including self-admission; corroborating identification by a reliable person; corroboration identification by an unreliable person; visible gang symbols such as gang colors and

tattoos; frequent presence in known gang areas; arrest for a known gang crime with other gang members; visiting a known gang member other than a family member in a penal institution; and using social media to recruit for a gang. (*Id.* at 70). "Reliable individuals" include school officials, apartment managers, store clerks, and police officers. (*Id.*). "Unreliable individuals" include gang members, codefendants, and cosuspects. (*Id.*). These criteria do not suggest that entry into the Gang Tracker Database was determined by an individual's race. Ponder testified that identification of an individual as a member of a particular gang was determined not based on race, but rather by symbols, colors, and tattoos reliably showing gang affiliation. (*Id.* at 87).

Flores has failed to point to summary judgment evidence that raises a factual dispute material to determining that his inclusion on the Gang Tracker Database, the City's use of that Database, or the training provided to officers on the Database, did not violate his equal protection rights. The court grants summary judgment to the City on Flores's claims related to the Database.

## VIII. The State-Law Claims Against the City

Flores's complaint is unclear about whether he alleges state-law tort claims against the City under the Texas Civil Practices and Remedies Code, but the parties appear to assume in the motion for summary judgment and response that Flores has brought claims under that Act. (*See* Docket Entry No. 100 at 17–19). Flores stated in his response to the defendants' motion to dismiss that he is entitled to punitive damages under § 41.003 of the Texas Civil Practice & Remedies Code because he has brought a "claim of gross negligence" against the City. (Docket Entry No. 98 at 25 (citing Docket Entry No. 78 at ¶¶ 61, 393)).

A governmental entity cannot be held liable in tort for the actions of its employees unless there is a constitutional or statutory provision waiving immunity. *See City of Amarillo v. Martin*,

971 S.W.2d 426, 427 (Tex. 1998). Clear and unambiguous language is necessary to show a waiver. *See Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994). The City is entitled to immunity from liability to Flores if there is no waiver. *Id.*

The Texas Tort Claims Act waives sovereign immunity in limited circumstances. *See Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 586 (Tex. 1996). Unlike a federal § 1983 action, a governmental unit may be liable for a government employee's negligence under *respondeat superior* if the Act has waived immunity. The Act provides:

> A governmental unit in the state is liable for:
>
> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
>> (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>>
>> (B) the employee would be personally liable to the claimant according to Texas law; and
>
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM. CODE § 101.021. Cities, as political subdivisions of the State of Texas, come within the Act. *See Vela v. City of McAllen*, 894 S.W.2d 836, 839 (Tex. App.—Corpus Christi 1995, no writ). For the City to be held liable for the acts of an officer under the Act, the claim must arise under one of three specific areas of liability and the claim may not fall within an exception to the waiver. *See Alvarado v. City of Brownsville*, 865 S.W.2d 148, 155 (Tex. App.—Corpus Christi 1993), *rev'd on other grounds*, 897 S.W.2d 750 (Tex. 1995). "The determination of a governmental entity's negligence will be made only after a claimant has cleared these two statutory hurdles." *Id.* at 155.

The Act does not waive immunity for intentional torts. *See Taylor v. Gregg*, 36 F.3d 453, 457 (5th Cir. 1994), *overruled in part by Castellano v. Fragozo*, 352 F.3d 939, 946 (5th Cir. 2003); *Riggs v. City of Pearland*, 177 F.R.D. 395, 405 (S.D. Tex. 1997); *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1008–09 (E.D. Tex. 1997). The Act states:

> This chapter does not apply to a claim:
>
> (1) based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or
>
> (2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

TEX. CIV. PRAC. & REM. CODE § 101.057. "This provision shields municipalities from suits arising out of intentional torts committed by governmental employees and should be liberally construed to accomplish this objective." *Gillum v. City of Kerrville*, 3 F.3d 117, 123 (5th Cir. 1993), *cert. denied*, 510 U.S. 1072 (1994) (citation omitted). If the essence of a Texas Tort Claims Act claim arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability. *See Callis v. Sellers*, 953 F. Supp. 793, 801 (S.D. Tex. 1996).

The City of Houston is a governmental unit to which governmental immunity applies. While the summary judgment evidence raises factual disputes material to determining whether Harris's decision to shoot Flores was objectively reasonable, it is undisputed that the shooting was an intentional act. *See Harris Cty. v. Cabazos*, 177 S.W.3d 105, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("Here, the gravamen of appellee's claim is that a Harris County sheriff wrongfully shot appellee . . . . If a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA.").

Flores's allegations fit squarely within the Texas Tort Claims Act's exception for claims

"arising out of assault, battery, false imprisonment, or any other intentional tort." TEX. CIV. PRAC. & REM. CODE § 101.057(2). The allegations and evidence do not suggests that Harris accidentally discharged his weapon, but instead show that Harris made an intentional decision to shoot Flores. *See Cabazos*, 177 S.W.3d at 112 ("In this case, appellee alleged in his petition that Haynes was negligent in discharging his pistol and in effectuating appellee's arrest, thus injuring appellee . . . . However, despite appellee's efforts to phrase his claims in terms of negligence, his focus is on the shooting of appellee.").

The court concludes that the City is entitled to summary judgment on Flores's state-law claims brought under the Texas Tort Claims Act because any claims he brings under that Act arise from Harris's intentional conduct, which is not covered under the Act.

## IX.    Punitive Damages

The City argues that Flores's claim for punitive or exemplary damages against the City fails because the City is entitled to immunity for the state-law claims and a § 1983 claim cannot give rise to punitive damages. (Docket Entry No. 100 at 27; Docket Entry No. 119 at 7). Flores has explained that he pleads "the basis for punitive damages against City defendant with its claim of gross negligence." (Docket Entry No. 98 at 25 (citing Docket Entry No 78 at ¶¶ 61, 393)). The City is correct that Flores cannot seek punitive damages against it. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

Flores has also not presented competent summary judgment evidence entitling him to punitive damages against the officers. While a plaintiff may be awarded punitive damages in § 1983 cases if he can show that the defendant's conduct was motived by evil motive or intent, *Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2017), Flores has not presented evidence demonstrating a genuine factual dispute material to showing whether the officers' actions were malicious, or

supporting an inference that they were malicious.

## X.   Conclusion

The officers' motion for summary judgment, (Docket Entry No. 102), is granted for all claims against Mawhood and for all claims against Harris except for Flores's excessive force claim. The City's motion for summary judgment, (Docket Entry No. 100), is granted. The defendants' motion to dismiss, (Docket Entry No. 79), is denied as moot.

SIGNED on March 29, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge